**TEXAS POWER & LIGHT COMPANY,**
Appellant,

v.

**F. M. HOLDER, Appellee.**

No. 82.

Court of Civil Appeals of Texas.

Tyler.

Dec. 31, 1964.

Rehearing Denied Jan. 21, 1965.

John Ramey, Ramey, Ramey & Neal, Sulphur Springs, Robert E. Burns, Burford, Ryburn & Ford, Dallas, for appellant.

Howard S. Smith, Sulphur Springs, Joe H. Tonahill, Jasper, for appellee.

MOORE, Justice.

This suit was brought by F. M. Holder, appellee, against Texas Power & Light Company, appellant, for damages for personal injuries alleging negligence on the part of the company in maintaining its power lines in such a manner as to allow an uninsulated portion thereof to come in contact with a television cable on which plaintiff was working, resulting in a severe electrical shock causing him to fall from a utility pole to the ground, inflicting severe and permanent injuries. Upon trial of the case, a jury verdict was returned in favor of Holder in the amount of $171,000.00. The trial court rendered judgment on the verdict for appellee Holder to which appellant, Texas Power & Light Company, has perfected this appeal. The parties will hereinafter be designated as they were in the trial court.

Plaintiff's cause of action was grounded on the negligence of the light company in the construction and maintenance of its line on both statutory and on common law grounds.

Defendant entered a general denial and alleged that plaintiff was a trespasser at the time of his injury and that the defendant therefore owed him no duty either statutory or at common law, alleged contributory negligence, and alleged that the conduct of the employees of Texas Community Antennas, Inc. was the sole proximate cause of the occurrence in question.

At the conclusion of the evidence the court overruled defendant's motion for instructed verdict, and the jury in its verdict found substantially as follows:

(A, A–1 and B) That defendant's employee Chalupa while acting in the course of his employment stated in effect to Holder that it would be safe for him to perform work on the pole where he fell.

(C) That at the time he fell, Holder was an invitee of defendant.

(1, 2 and 2–A) That the electrically charged service wire came into contact with the television messenger wire where the two crossed and that defendant's failure to maintain the electrically charged wire at least 22 feet above the ground was negligence and a proximate cause of the injuries to the plaintiff.

(3 and 4) That defendant maintained its electrically charged service wire closer to the ground at the point of the crossover at the messenger wire than such would have been maintained by a person of ordinary care, which was a proximate cause of the injuries.

(5 and 6) That defendant failed to properly inspect the electrically charged service wire and that such was a proximate cause of the injury.

(7, 8 and 9) That the defendant failed to maintain its electrically charged service wire effectively insulated in a suitable manner for the conditions to which it was subjected at the point of the crossover, and failed to use ordinary care in maintaining its wire effectively insulated which was a proximate cause of the injury.

(10) That Holder did not fail to keep a proper look-out for his own safety.

(12) That the occurrence was not an unavoidable accident.

(13) That the sum of $141,000.00 would reasonably compensate plaintiff.

(13–A and 14) That the sum of $18,200.-00 would reasonably compensate plaintiff for past medical expenses and the sum of $11,800.00 would reasonably compensate him for future medical expenses.

(15) Plaintiff's failure to wear protective gloves was not negligence.

(17) Plaintiff's failure to use a safety belt was not negligence.

(19) Plaintiff was not negligent in permitting the aluminum conduit he was carrying to remain in contact with the ground.

(21) Plaintiff was not negligent in placing his bare hands on the messenger wire.

(23) That he did not fail to properly inspect the surrounding area to determine whether the messenger wire was free from electrical energy.

(26) That the conduct of Texas Community Antennas, Inc., in placing the messenger wire under the electrical wire was not the sole proximate cause of the occurrence.

(27) That the employees of Texas Community Antennas, Inc., did not cause the messenger wire to be jerked into defendant's electrical wire.

The court overruled the defendant's motion for judgment non obstante veredicto and entered a judgment awarding the plaintiff the net sum of $137,997.18 and Hanover Insurance Company, intervenor,

878

the sum of $33,002.82 which represented the amount of its subrogation claim for Workmen's Compensation and medical benefits paid by the company as a result of the plaintiff's injury. The evidence is undisputed that plaintiff was severely injured, resulting in permanent injuries to various vital organs of his body, as well as permanent paralysis of his body from the chest down. The amount of the award is not assailed as being excessive.

Plaintiff, F. M. Holder, at the time of his injury was an employee of Texas Community Antennas, Inc., which will be hereinafter referred to as the "television company." This company was in the business of transmitting television service into homes in Sulphur Springs, Texas, and elsewhere by the use of coaxial cables. In conducting this business the television company used the poles of both the local telephone company and the poles of defendant, Texas Power & Light Company, for the purpose of supporting the coaxial cable. This arrangement was by contract.

On June 12, 1960, five days before the occurrence in question, a storm had struck the city of Sulphur Springs causing extensive damage to all utility lines in the Main Street area. Poles and lines belonging to defendant, as well as to the telephone company, were damaged and destroyed. Defendant's lines were situated on the north side of the street while those of the telephone company were on the south side. Near the place where the plaintiff was injured, defendant supplied electrical service to the "Wright" house which was situated on the south side of the street. Before the storm the 120-volt service wire supplying the Wright house originated at defendant's 7200-volt main line on the north side of the street and extended in a southerly direction across the street where, according to the testimony of defendant, it was connected to a service pole from which a wire then ran directly into the "Wright" house. This service pole on the south side of the street was destroyed by the storm and the service to the house was interrupted. Electrical service was restored the following day by running the service wire directly from the main line on the north side of the street across the street into the Wright house without replacing the broken service pole on the south side of the street. In restoring the line the old wire was used, much of which was shown to be without any coating or insulative substance covering the copper wire. After the service wire was replaced to the Wright house, the telephone company reconstructed its poles and lines which ran in front of the Wright house on the south side of the street, constructing same under defendant's service wire much in the same manner as they were prior to the storm.

A few days after both the power lines and telephone lines had been thus replaced, the television company commenced upon an extension of their cable along Main Street commencing near the city and extending to the west.

The company first installed a steel messenger wire used to support the coaxial cable on the telephone poles on the south side of the street. This wire was installed approximately 15 or 16 inches above the nearest telephone cable and was the uppermost wire on the poles. This wire passed beneath the electrical wire leading to the Wright house at a distance of between 21 inches and 24 inches.

On June 17th plaintiff was assigned the task of installing certain television attachments on the various poles along the new extension of the line. At about 1:00 p. m. that date after he had installed television attachments on the poles on the east end of the extension, he then proceeded to the west end of the line for the purpose of making another attachment. At this point the television messenger wire had been attached to a power pole owned by defendant, which pole was also being used by the telephone company. Plaintiff ascended the pole by the use of a ladder and climbed to a height of approximately 18 feet carrying with him one end of a piece of metal

conduit, the other end of which remained on the ground. On reaching his desired height, he placed his hand on the television messenger wire when he received a severe electrical shock which knocked him from the ladder and onto the ground causing his injuries.

While plaintiff was on the ladder and at about the time he placed his hand on the wire, the other members of the television crew were working at approximately 800 to 1,000 feet east of him in the vicinity of the Wright house and were in the process of wrapping the coaxial cable around the messenger wire. This operation was being performed by the use of a wrapping machine which was attached to the messenger wire. At the time of the plaintiff's injury, the wrapping machine was being pulled along the steel messenger wire when it became hung. In an effort to dislodge it, the crew jerked on the rope which was attached to it causing the messenger wire to jump up and down. While they were doing this, they noticed sparks coming from the wrapping machine which led them to believe that the messenger wire had come in contact with a charged wire somewhere along the line. They ceased activities and made an effort to locate the trouble. Shortly, they came to the point where defendant's service line leading to the Wright house from defendant's pole across the street crossed the television messenger wire. At this point they observed the two wires to be approximately two feet apart and deducted that this was the point of contact. On observing a crowd of people further up the line, they investigated and found that the plaintiff had been injured in a fall from the pole. Thereafter, the crew encountered defendant's repairman in the vicinity of the Wright house and requested that he put a rubber hose over the line at the point of the crossover in order to prevent further contact between the wires. This was done and the crew then completed their wrapping operation without further incident. The wire leading to the Wright house was attached to the pole at a point 25 feet above the ground; it then ran in a southerly direction where it ultimately connected to the Wright house 19 feet 5 inches above the ground, a distance on the ground of 158 feet; the length of the wire covering this distance was calculated by the plaintiff's witness to be 187 feet in length, while defendant's witness calculated same to be less than 175 feet. Admittedly, there was some slack in the wire but the degree thereof was in dispute.

At the point of the crossover, the lateral distances on the ground show that the black top or paved surface of Main Street was 26 feet 7 inches wide. From the edge of the paved surface extending toward the Wright house was a gravel shoulder which was 7 feet wide. From the edge of the shoulder there was a gradual downslope extending 11 feet to the lower point of a shallow bar ditch and then a gradual rising slope to the point directly beneath where the two wires crossed. The latter described 15 feet being a dirt area covered with grass was not ordinarily used for vehicular traffic, although the terrain in the area where the two wires crossed was such that it could have been used to some extent by vehicles. The Wright property abutted the south right-of-way line of the street or roadway. The telephone poles carrying the television cable ran along the south edge of the road right-of-way at a distance of approximately 6 feet outside or north of the Wright fence line. The lines on the telephone poles were directly above what was described as the "walk way" running in front of the Wright house and crossed over the driveway. The defendant's electrical line crossed over above the television wires at a point 2½ feet west of the traveled portion of the driveway.

It is not disputed that the point where the two lines intersected was directly above the walk way and was within the street right-of-way. Defendant admits that its electrical line at this point was less than 22 feet above the ground. Defendant tendered testimony showing the height to be 19 feet 1 inch, while plaintiff's testimony showed it to be 17½ feet.

Plaintiff's witness, McWilliams, testified that shortly after plaintiff's injury he observed that the defendant's service wire in front of the Wright house to be resting on the television messenger wire and was sagging over each side of the messenger wire.

Plaintiff tendered a witness who testified that upon investigation, he found the distance between the two wires at the point of this intersection to be 21 inches, while defendant's witness testified that the distance was 24 inches. Defendant's line foreman testified that upon investigation shortly after Holder's injury, he discovered a place on the television wire had been burned at the point of the crossover and observed the wire to be sagging and determined that the wire was too low at this point.

In Points 1 through 4 defendant complains of the submission of Special Issues 2 and 2–A inquiring as to whether the failure on the part of the company to maintain its electrical line at least 22 feet above the ground was negligence and a proximate cause. Complaint is made on the ground that (1) the submission of Special Issue No. 2 and the accompanying instruction amounted to a comment on the law and the evidence in that it informed the jury that the defendant was required to maintain its service line at least 22 feet above the ground, and (2) there was no evidence or at least insufficient evidence to support the submission of the issues. The same complaint is also made of the submission of Special Issues No. 3 and 4 wherein the court inquired as to whether the defendant maintained its service wire closer to the ground than same would have been maintained by a person of ordinary prudence in the exercise of ordinary care and whether such was a proximate cause.

The basic conflict between the plaintiff and defendant involves the height at which defendant was required to maintain its electrical wire at the point it crossed over the television wire. Defendant first contends that under the provisions of Article 1436a, Vernon's Ann.Civ.Tex.St., which adopted the provisions of the National Electrical Safety Code as a part of the law of this state, required a height of only 15 feet and therefore, since the undisputed testimony shows the wire to have been more than 15 feet above the ground defendant owed the plaintiff no further duty. Defendant further contends that the provisions of Article 1436a do not require all electrical wires upon or across roadways to be 22 feet above the ground, but requires only those lines which cross the *surface of the traffic lane* be 22 feet above the surface, contending that the provisions of the new statute repealed the provisions of Article 1436 requiring the wire to be 22 feet *above the ground,* and substituted in lieu thereof the National Electrical Safety Code which requires a minimum height of only 15 feet above the ground for all lines except in instances where the wire is placed above the traffic lane as provided in Article 1436a.

We do not believe that this construction advocated by the defendant finds application to the factual situation and the verdict of the jury in this cause. As stated before, defendant freely concedes that the service wire leading to the Wright house was less than 22 feet above the ground where it crossed the television wire. It was conclusively shown that the television wire was constructed with the right-of-way of the street at the point of the crossover.

■ This court is committed to the view that the provisions of Article 1436 were not repealed by Article 1436a and therefore the maintenance of the electrical line along or across a road or street at a lower level than 22 feet as provided for therein amounts to a violation of the statute.

Article 1436 aforesaid gives the public utilities the right to erect its lines across public roads, etc., and specifically provides:

"* * * Such lines shall be constructed upon suitable poles in the most approved manner and maintained at a

height above the ground of at least twenty-two feet; * * *."

Article 1436a gives the public utilities the right to maintain and operate its lines over and across highways and specifically provides:

" * * * Except as modified or changed by ordinance or regulation in incorporated cities and towns, all lines for the transmission and distribution of electric energy, whether along highways or elsewhere, shall be constructed, operated and maintained, as to clearances, in accordance with the National Electrical Safety Code, as published in March, 1948, by the National Bureau of Standards, Handbook 30, provided that lines along highways and county roads shall be single pole construction, and provided that at any place where a transmission line crosses a highway or road it shall be at least twenty-two (22) feet above the surface of the traffic lane. * * *"

In construing these two statutes, we adopt the language of the Waco Court of Civil Appeals wherein the court said: "This Court is of the view that Article 1436a aforesaid does not specifically repeal Article 1436 aforesaid. We think the effect of that statute is to make it a little more specific in that it does provide that at any place where a transmission line crosses a highway or road it shall be at least 22 feet above the surface of the traffic lane." Texas Power & Light Company v. Jacobs (Tex.Civ.App.), 323 S.W.2d 483. We take it to be common knowledge that in most instances the surface of the traffic lane on streets and highways are built up above the ground level and in the case of bridges, the surface of the traffic lane is sometimes many feet above the ground. One of the purposes of Article 1436a was to add an additional requirement requiring a clearance of 22 feet above the surface of the traffic lane regardless of the ground level.

We believe that the Legislature in passing Article 1436a adopting the provisions of the National Electrical Safety Code requiring a clearance of only 15 feet above the ground intended the provisions thereof to apply to lines which are not over a street or roadway nor cross the surface of a traffic lane of a street or highway. The provisions of the National Electrical Safety Code contain general provisions, while Article 1436 specifically provides that all lines crossing public roads or streets shall be maintained at a height above the ground of at least 22 feet. In construing and harmonizing statutes, the general rule is that the specific will control over the general. Trinity Universal Insurance Company v. McLaughlin, (Tex.Civ.App.) 373 S.W.2d 66. Since it is undisputed that the defendant's lines were maintained at a height of less than 22 feet at a point within the confines of the street right-of-way which is prohibited by the provisions of Article 1436, we think negligence was established as a matter of law.

It is apparent from the court's charge that the trial court took the position that Article 1436 was controlling requiring defendant to maintain its lines at least 22 feet above the ground. Though the uncontroverted facts showed negligence as a matter of law, the trial court nevertheless submitted the issue of negligence to the jury. In framing the issue, the court assumed the wire to be less than 22 feet above the ground. This is assigned as being erroneous in that it amounted to a comment on the weight of the evidence. We do not believe the issue to be subject to such objection. There being no evidence that the wire was situated at a height of more than 22 feet above the ground, it was not error to submit the issue containing a statement of an uncontroverted fact. Dillingham v. Currie (Tex.Civ.App.), 92 S.W.2d 1122; Mason v. Yellow Cab & Baggage Co., 153 Tex. 344, 269 S.W.2d 329.

In connection with Special Issue No. 2 the court submitted the following special instruction:

" 'Height of electrically charged service wires,' you are instructed that this term means that electric power corporations operating in this State that erect their electric power lines over and across any public road are subject to the following requirement: 'Such lines shall be constructed upon suitable poles in the most appropriate manner and maintained at a height above the ground of at least twenty-two feet.'

"As tied to the Issues of this case, the term 'such lines,' with which the preceding sentence begins, refers to power lines in general. The laws of this State require a power company to maintain such lines at least twenty-two feet above the ground."

The instruction is attacked as being contrary to the law and as being an incorrect statement of the law.

■ Rule 277 provides that in submitting special issues the court shall submit such explanatory instructions and such definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues. Although the instruction given here is thought to be unnecessary in that it was not of any assistance to the jury in answering the issue, the statement as to the law is not thought to be prejudicial. In view of the construction which we place upon the statute, the submission of the instruction is not considered to be such as to mislead the jury or to deprive the defendant of any valuable right and therefore was not, in our opinion, such error as to cause and probably caused the rendition of an improper judgment. Rule 434, T.R.C.P.

Even though we should be incorrect in our construction of the statutory law, the jury found that the maintenance of the line at the time and place in question was closer to the ground than an ordinary prudent person would have maintained same under the same or similar circumstances, and that such conduct was the proximate cause of the accident.

■ If we be correct in our holding that the provisions of the National Electrical Safety Code have no application to electrical lines immediately above public streets or highways, then certainly there is ample evidence to sustain the jury's finding of negligence and proximate cause on both statutory and common law grounds. Defendant's line obviously came into contact with the messenger wire charging same with electrical current which was the cause in fact of the injury. The fact that the wire was uninsulated by a dielectic material and was constructed and maintained at a distance from the ground lower than that required by law would create a situation where a reasonably prudent person in the exercise of ordinary care in light of all the facts would have anticipated and foreseen hazard and injury. It was not essential that defendant should have foreseen the precise injury to any particular individual; but merely that some like injury might and probably would result. Texas Public Service Co. v. Armstrong (Tex.Civ.App.), 37 S.W.2d 294.

Nor are we able to agree with defendant's contention that the evidence is insufficient to support the jury's verdict on Special Issues 2 and 2–A. We have concluded that there was no error either in the submission of these issues or in the refusal of defendant's motion for instructed verdict or the motion for judgment non obstante veredicto. Defendant's Points 1 through 4 are overruled.

By Points 5 through 8 it is contended the trial court erroneously submitted Special Issues 5, 6, 7, 8 and 9 inquiring whether the failure to insulate and properly inspect the line was negligence and a proximate cause asserting no evidence and insufficiency of the evidence.

It was undisputed that defendant's service wire was bare and without covering at the point it crossed above the television wire. It is likewise undisputed that no inspection was made after it was reconstructed.

Defendant again maintains that the provisions of the National Electrical Safety Code controls and that at the point of the crossover the line was maintained in compliance with the height requirement of 15 feet and therefore the line was properly insulated by height, i. e. height amounts to insulation, whether the line was covered with insulating material or not and having no knowledge that the television line was constructed beneath their line in close proximity, defendant had no duty to make continuous inspections. Defendant called three expert witnesses who testified that the height of the line complied with the code. Defendant therefore contends that there was effective insulation by air-space and hence there was no evidence, or at least insufficient evidence, to establish a duty to use any other type of insulation or make inspections.

■ We are unable to agree with this contention. As pointed out before, we failed to see how the provisions of the code concerning height would have any application to the circumstances presented here because of the fact that defendant's electrical lines are shown to be over and across a street or highway. Under these circumstances the statutory law prevails and requires the height of the line to be at least 22 feet above the ground, as well as 22 feet above the surface of the traffic lane. Height provisions in the code do not apply to lines which extend along and over streets and highways; hence, proof of 15 feet of air-space above the ground at such places does not amount to proof of insulation as a matter of law. On the other hand, no statute specifically prescribes a duty to insulate electrical wires extending along and over streets and highways, nor imposes a duty of inspection. If these duties exist, they must rest upon the common law concept of the standard of care of the ordinary prudent person.

■ A proprietor dealing with so dangerous and deadly an agency as electricity is bound to a continuous inspection to the end of seeing that his wires are properly insulated so as to render them harmless at as early a period as is consistent with a high degree of care and diligence. The obligation of exercising a degree of care proportionate to the danger obviously demands nothing less than this. Jacksonville Ice & Electric Co. v. Moses, 63 Tex.Civ. App. 496, 134 S.W. 379; Galveston-Houston Electric Ry. Company v. Reinle, 113 Tex. 456, 258 S.W. 803.

■ Defendant knew that the height of its lines did not comply with the law and also knew that in all probability other utility lines would be constructed in close proximity therewith. A potentially dangerous situation was thus created of which defendant had knowledge which would, under the circumstances, require no less than due care. Such care would embrace the duty to inspect and by such inspection to prevent the low, uninsulated wire from injuring persons working on other wires within close proximity therewith pending restoration of the statutory requirements. Texas-Louisiana Power Co. v. Webster, 127 Tex. 126, 91 S.W.2d 302; Jacksonville Ice & Electric Co. v. Moses, supra; West Texas Utilities Co. v. Dunlap (Tex.Civ.App.), 175 S.W.2d 749; 29 C.J.S. Electricity § 46.

■ Moreover, other provisions of the Electrical Code require that all electrical lines be either insulated with some dielectic substance or that they be maintained at a distance of not less than 24 inches of any other wire. There is evidence in the record that defendant's wire was maintained less than 24 inches from the television wire. Under the circumstances, we think there was both a duty to insulate and to inspect. The record contains evidence of sufficient probative force, if believed by the jury, to support the jury's finding upon the ques-

tion of negligence both with respect to the failure to insulate as well as the failure to inspect and under these circumstances, such findings are binding upon this court. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194. Furthermore, we believe that defendant could have reasonably foreseen that the telephone lines and other utility lines would be constructed in close proximity to their uninsulated wire and might come in contact with other wires resulting in injury to those whose duties called them to work upon other utility lines in close proximity therewith. Snyder Ice, Light & Power Co. v. Bowron (Tex.Civ.App.), 156 S.W. 550; San Antonio Gas & Electric Co. v. Badders, 46 Tex. Civ.App. 559, 103 S.W. 229; Jezek v. Texas Power & Light Company (Tex.Civ.App.), 282 S.W.2d 112; Texas Power & Light Company v. Jacobs, supra.

■ The fact that the plaintiff's employer may have also been negligent in constructing the television messenger wire at the place in question would not relieve the defendant of liability for its negligence. Snyder Ice, Light & Power Co. v. Bowron, supra. Upon examining all of the evidence in the record, we have concluded that there is sufficient evidence to support the verdict of the jury in their answers to these special issues and therefore overrule all Assignments of Error relating thereto.

Points 9, 10 and 11 present the contention that the court erred in rendering judgment for the plaintiff because there was no evidence showing that the plaintiff was an invitee at the time he went upon the defendant's power pole. Defendant asserts that the undisputed evidence shows that plaintiff was not an invitee, but a trespasser and in any event there was insufficient evidence to prove that he was an invitee.

The jury in response to Special Issue No. C found Holder to be an invitee. In response to Special Issue Nos. A, A–1 and B, the jury found that the defendant's employee, Chalupa, while acting in the course of his employment, assured Holder that it would be safe for him to perform work on defendant's power pole and that Holder relied upon such assurances.

The record reveals that Texas Community Antennas, Inc. first commenced to do business in Sulphur Springs in 1953. At the time they commenced to do business, the company entered into an agreement with defendant, Texas Power & Light Company, for the use of its poles in attaching their television cables. The contract provided that before any attachments were to be made, the television company would first make application to the defendant for a permit. The application was to be made in accordance with a form attached to the contract in which the television company was to state the number of poles desired to be used, and was to attach a sketch of the location of their lines.

According to the testimony of the officials of the television company, the company had on several previous occasions in prior years extended their lines, but had not made a practice of filing application and obtaining a permit in accordance with the terms of the contract. According to the testimony of Donald McFadden, the local manager, a practice had been adopted whereby upon desiring to extend their lines he would call upon Mr. Thompson, the line foreman of the defendant, and the two of them would ride out and look over the proposed extension and after explaining to Mr. Thompson what he proposed to do, he would then proceed to extend the lines and use the poles of the defendant. When it was necessary to install meters on the new extension, he would then call the local office of the defendant and notify them as to where the meters were to be installed and the company would then dispatch one of their men to that location. It is uncontroverted that prior to this occurrence there had never been any dispute between the television company and the defendant as to the use of this, or any other poles, nor the monthly rental charged therefor. Mr. McFadden testified that at the time of the Main Street extension he did not make any arrangements with the defendant be-

cause it was his understanding that Mr. Rogers, the president of the company, was to be responsible for the arrangements on this extension. Neither he nor Rogers was able to remember any specific arrangements with the defendant concerning this extension, but McFadden testified that since the extension had been under consideration for some time he was sure that there were telephone calls made to the company requesting meter loops to be connected in that area and also telling them that they were going into that area. It was without dispute that no formal application was made prior to the Main Street extension.

As we understand the testimony, the method used by the defendant in keeping a record of the poles rented by the television company was by the use of a map of the city on which an "X" was marked at the point where the television company was renting the pole. Each year the officials of the two companies would get together and agree on the number of poles in use, as well as the location, and the television company would be billed for the rental on that basis. Circumstantially, at least, the system of using applications and permits had been abandoned.

Defendant's employees denied any prior knowledge of the extension at any time before the morning of the day on which Holder was injured. Defendant admits that on the morning of June 17th a phone call was received requesting that a meter loop be installed on the new extension at one of the defendant's poles on Main Street near Clark Store and in response to this call their lineman, Chalupa, was dispatched there to make the installation.

According to the plaintiff Holder, he and Chalupa met at the power pole near Clark Store during the morning of June 17th. They both worked on the pole installing the meter loop and television attachments and while there they discussed the next installation which was to be the McWilliams Store which was several blocks toward the west end of the line. Holder testified that

on this occasion he asked Chalupa whether the line of the defendant's pole was safe and he was assured that it was; that he and Chalupa then made arrangements to meet at this pole after Holder had obtained another television attachment. He proceeded to the second pole sometime after lunch. After he had fallen from the pole, Holder testified that Chalupa was one of the first to come to his aid and that he took his safety belt off and placed it in the truck. Chalupa denied all of this testimony and denied ever having seen Holder on this occasion. Later in the day, however, after Holder's injury, he did install a meter loop on the pole where Holder had fallen.

According to the testimony of the plaintiff's witness McWilliams, Chalupa, together with another man drove along the street near his store earlier in the day at which time he observed Chalupa to be looking and pointing toward the pole where Holder later fell.

■ "A person is a trespasser where he enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license, not in the performance of any duty to the owner or person in charge or on any business of such person, but merely for his own purposes, pleasure, or convenience, or out of curiosity, and without any enticement, allurement, inducement, or express or implied assurance of safety from the owner of person in charge." Texas-Louisiana Power Co. v. Webster, supra.

■ An invitee is defined as a person who goes on the premises of another in answer to the express or implied invitation of the owner or occupant on the business of the owner or the occupant or for their mutual advantage. 65 C.J.S. Negligence § 43(1), p. 508.

■ An implied invitation is one which is held to be extended by reason of the owner or occupant doing something or per-

mitting something to be done which fairly indicates to the person entering that his entry and use of the property are consistent with the intentions and purposes of the owner or occupant, and leads him to believe that the use is in accordance with the design for which the place is adapted and allowed to be used in mutuality of interests. 65 C.J.S. Motor Vehicles § 172, p. 510.

A servant or employee of another person who enters the premises on the business of his master, in which business the master and the owner or occupant have a mutual interest occupies the status of an invitee. Snelling v. Harper (Tex.Civ. App.), 137 S.W.2d 222; 65 C.J.S. Motor Vehicles § 174, p. 515.

The agreement between the defendant and the television company as originally written contemplated an application and a written permit before use was made of any of its poles. In practice, however, the testimony shows that several extensions had been made in which no application or permit was required. There is testimony showing that other extensions were made upon oral notice which notice was accepted and acknowledged by the defendant. This testimony and that of Donald McFadden wherein he stated that he was sure that the defendant had been notified of the extension, together with that showing defendant's agent, Chalupa, was present in the area where the extension was under construction and actively performed work thereon on the morning before plaintiff's injury, together with evidence showing that requirement of permits had to some extent been abandoned would, in our opinion, constitute some evidence of probative force, as well as sufficient evidence to support the jury's finding that the plaintiff was using the pole at least by an implied invitation of the defendant. In view of the established fact that there was a mutual financial interest involved between the two companies, we think it can be said that the owner of the pole by having failed to require permits in accordance with the contract did

something or permitted something to be done which would fairly indicate to the plaintiff's employer that entry and use of the pole was consistent with the intention and purpose of the defendant and was thus led to believe that the use thereof was in accordance with its previously designed use and allowed to be used in mutuality of interest.

Plaintiff's employer thus being an invitee, plaintiff occupied the same status and defendant owed him the duty of maintaining its lines in a reasonably safe condition. Standard Light & Power Co. v. Munsey, 33 Tex.Civ.App. 416, 76 S.W. 931; Texas Public Service Company v. Armstrong, supra; Texas-Louisiana Power & Light Company v. Webster, supra. Points 9, 10 and 11 are accordingly overruled.

Complaint is made in Point 12 of the submission of Special Issue No. C and the accompanying definition of "invitee" because it presented an incorrect definition which was calculated to mislead the jury. The definition complained of is as follows:

"You are instructed that an 'invitee' is one on the premises of another with the owner's knowledge or consent, either express or implied, to engage in an undertaking for the mutual benefit of the said owner and the one to be employed."

In addition to other objections defendant objected to the last phrase of the definition wherein reference is made to "the one to be employed," because it is thought to have indicated to the jury that plaintiff was to be employed by the defendant. The record contains no evidence to so indicate and we hardly see how the jury could have so construed it in this manner. We think it just as reasonable that the jury could have construed the phrase as referring to the plaintiff who the evidence shows was the one to be employed upon the premises by the television company. The other objections are thought to be without merit.

Although we do not wish to be understood as approving the definition in every respect, yet as applied to the facts of this case we have concluded that the definition was not such as to cause, and probably did cause, the rendition of an improper judgment. Rules 434 and 277.

Points 13 and 14 assert that the trial court erred in entering judgment for the plaintiff because the undisputed evidence shows that the conduct of the television company in constructing its messenger wire below the defendant's service wire was either the sole proximate cause or was a new and independent cause of plaintiff's injuries.

Stated conversely, it is contended that even though the defendant may have been guilty of negligence, such negligence was not a proximate cause of the injury due to the fact that it was broken by a new and independent cause, to-wit—the unforeseeable conduct on the part of the television company in constructing its lines beneath those of the defendant.

Since both assignments relate to the casual relation between the negligence of the defendant and the conduct of the television company relative to injuries complained of, they will be considered together.

■ While we have heretofore stated that it is our belief that the defendant should have reasonably anticipated and foreseen injury due to the fact that it maintained a low, uninsulated wire over the street, we are of the further opinion that defendant cannot escape liability on the ground now presented because under the facts of this case the concept of concurrent negligence would apply.

■ From those who handle electricity and similar dangerous commodities, the law exacts a duty to protect those who come in proximity therewith, which duty is proportionate to and commensurate with the dangers involved. The courts have considered and applied this rule in many cases.

Robert R. Walker, Inc. v. Burgdorf, 150 Tex. 603, 244 S.W.2d 506, 509; Texas Power & Light Co. v. Culwell (Tex.Com.App.), 34 S.W.2d 820; Texas Public Service Co. v. Armstrong, supra.

■ The rule to be applied in concurrent negligence cases is to be found in the case of McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W.2d 442, 447, wherein the Supreme Court said:

"* * * We think it is the generally accepted rule as applied to torts that 'If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.' Restatement of the Law of Torts, Vol. 2, p. 1184, § 439. Stated in another way, 'The intervention of an unforeseen and unexpected cause is not sufficient to relieve a wrongdoer from consequences of negligence, if such negligence directly and proximately co-operates with the independent cause in the resulting injury.' (Citing cases.)"

■ Where the facts show that the original act of negligence was superseded by a new and independent cause there is no liability where the consequences of the new cause could not have been reasonably anticipated or foreseen. Robert R. Walker, Inc. v. Burgdorf, supra.

But the rule is not without exception as pointed out in Gulf, C. & S. F. Ry. Co. v. Ballew (Tex.Com.App.), 66 S.W.2d 659, 661:

"* * * When the new cause or agency concurs with the continuing and co-operating original negligence in working the injury, the original negligence remains a proximate cause of the injury, and the fact that the new

concurring cause or agency may not in such case have been reasonably foreseeable should not relieve the wrongdoer of liability. That such fact does not so relieve him is held in Texas Power & Light Company v. Culwell, and Texas *Public Service Company v. Armstrong,* supra, and by the following other authorities: Sandel v. State, 115 S.C. 168, 104 S.E. 567, 13 A.L.R. 1268; Mahoney v. Beatman, 110 Conn. 184, 147 A. 762, 66 A.L.R. 1121."

Thus, even though it be undisputed that some new cause or agency concurred, yet the facts show that the continuing and cooperating original negligence of the defendant remained a proximate cause of the injury and the fact that the new and concurring cause or agency may not have been reasonably foreseen should not relieve defendant of liability. Because of the degree of care required by those who handle electricity, it cannot be said, as a matter of law, that the negligence of the defendant was not a proximate cause of the injury. Points 13 and 14 are overruled.

It is next contended by Points 15 and 16 that the trial court erred in entering judgment for the plaintiff because the undisputed evidence shows plaintiff was guilty of contributory negligence as a matter of law, and alternatively that the jury's finding on all issues relating thereto are against the great weight and preponderance of the evidence.

■■■ It is without dispute that the plaintiff placed his hand on the television messenger wire without using protective gloves or making use of his safety belt, and at the same time permitted the aluminum conduit he was carrying to touch the ground. The television wire was not, however, the type of wire that would ordinarily be charged with electric current and we find nothing in the record which would, as a matter of law, place plaintiff on notice of the danger involved, and are therefore unable to say as a matter of law that the conduct of the plaintiff on the occasion in question was such as to amount to contributory negligence. Texas & New Orleans R. Co. v. Day, 159 Tex. 101, 316 S.W.2d 402; Texas-Louisiana Power Company v. Webster, supra.

■■■ The question of contributory negligence is generally, by reason of the very nature of the defense, one for the jury to decide. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696; McAfee v. Travis Gas Corp., supra.

The jury answered all issues in a manner favorable to the plaintiff. After having carefully considered all of the testimony, we find ourselves unable to agree with defendant's contention that such findings are against the overwhelming weight and preponderance of the evidence and accordingly overrule these points.

Point 17 presents the contention that the trial court erred in permitting plaintiff, over objection, to introduce evidence showing that defendant took remedial action in placing a rubber hose over its service wire.

■■■ Although evidence of remedial action is ordinarily not admissible, yet under the circumstances presented here, we are of the opinion that its admission does not constitute reversible error.

The matter was first gone into in response to a question propounded by defendant's counsel to the plaintiff's witness, McWilliams, who testified that after the plaintiff's injury, defendant's employee, Chalupa, "went back to his pickup and got two rubbers and stuck on them service wires across that television cable." On re-direct examination counsel for the plaintiff inquired of the witness where Chalupa put the rubber hose or covering over the wire and he replied, "right where they crossed the television cable." No objection was made to this testimony nor was

there a motion made to strike. In testifying on direct examination for the defendant, Chalupa testified that at the request of the television crew he had placed a rubber covering over the wire. Under these circumstances we think the point was waived. John F. Buckner & Sons v. Allen (Tex.Civ. App.), 289 S.W.2d 387; Howell v. Bowden (Tex.Civ.App.), 368 S.W.2d 842.

Point 18 complains of the action of the trial court in refusing to permit defendant to present evidence showing the effects of a violent storm which occurred shortly before the occurrence in question.

 With respect to this assignment, we think it would be a fair statement to say that the record is replete with testimony showing that all of the utility lines on Main Street were severely damaged as a result of the storm. The only complaint properly presented in the Brief complains of the exclusion of the proffered testimony of defendant's witness Thompson where he offered to testify that the service pole near the Wright house which had previously supported the service wire was blown down as a result of the storm. In view of all the other testimony in the record making reference to the storm and the effects thereof, we think the jury was fully apprised of the devastating effect of the storm upon defendant's lines as well as the great stress placed on its personnel and therefore failed to see how the refusal of this testimony can be said to have caused the rendition of an improper judgment. Rule 434. T.R.C.P.

By Point 19 defendant contends that the trial court abused its discretion in permitting the plaintiff to file, within 30 minutes prior to the jury selection, a trial amendment wherein it was alleged that plaintiff suffered a loss of earnings not only as a lineman, but as a dairyman.

It is well settled that the trial court has broad discretion in allowing the filing of trial amendments. In the qualifying of the Bill of Exception made in connection herewith, the court stated that he was allowing the same to be filed in response to a special exception filed by the defendant. The filing of this amendment would be prejudicial only if it came as a surprise and deprived defendant of the right to properly prepare its defense. Since no motion for postponement or continuance was requested, defendant waived the right to complain. But even so, we find no abuse of discretion. Rule 63, T.R.C.P.

Point 20 re-urges the proposition that the undisputed facts show no liability and therefore the trial court committed error in failing to instruct a verdict in its favor and in failing to grant their motion for judgment notwithstanding the verdict. The matters presented here have herein before been discussed and found to be without merit.

Finding no reversible error, the judgment of the trial court is affirmed.

Affirmed.