**Urbain DARDAR, Plaintiff,**

v.

**STATE OF LOUISIANA, Louisiana State Dept. of Highways and the ABC Insurance Co., Defendants.**

**Civ. A. No. 70–174.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 1, 1971.

---

Louis B. Merhige, Baldwin & Merhige, William L. Crull, III, New Orleans, La., for plaintiff.

Kendall Vick, O'Keefe, O'Keefe & Fedoroff, New Orleans, La., for defendants.

CASSIBRY, District Judge:

This is an action brought by the plaintiff, Urbain Dardar, under the Jones Act and the General Maritime Law to recover for injuries allegedly sustained in the course of his employment by the defendant Louisiana Department of Highways. The matter was tried to the court on January 14, 1971 and taken under advisement. Upon consideration of the testimony adduced at trial, the stipulations made by counsel for the respective parties, and the depositions and exhibits received into evidence at trial, the court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.

The plaintiff, Urbain Dardar, was an employee of the defendant, Louisiana Department of Highways. In November, 1967, Dardar was assigned to work aboard a ferry boat which traversed Goose Bayou near Lafitte, Louisiana. The ferry was at all material times owned, operated and controlled by the Louisiana Department of Highways. It had been placed into operation in order to provide a means of crossing Goose Bayou while a nearby bridge was being rebuilt.

**2.**

In the area of the ferry crossing, Goose Bayou is approximately 130 to 150 feet wide and 10 to 12 feet deep. It is directly affected by a two or three foot tidal action from the Gulf of Mexico. Small and medium size watercraft, both commercial and pleasure varieties, can and in fact do navigate on Goose Bayou directly to the Gulf of Mexico and to the Intercoastal Waterway.

**3.**

The ferry boat in question was designed and built by Avondale Shipyards of New Orleans. It had a length of 60 feet, a beam of 32 feet, height of 15 feet, draft of one foot, two inches, and a tonnage displacement of 93 tons. It had the capacity to carry six average size automobiles.

**4.**

The ferry had Coast Guard numbers, navigational lights, and a three-man crew. It was towed to Goose Bayou by tugboat.

**5.**

The ferry was operated between the banks of Goose Bayou along a cable which was stretched across the water and secured by winches on either end. These winches were located on land, about 10 feet from the water's edge, and secured onto stanchions of railroad ties which in turn were secured to wooden pilings driven into the ground.

**6.**

The cable passed through the ferry and went around two drums or pulleys aboard the ferry. These drums or pulleys were turned or rolled by two gasoline engines on the ferry. This turning or rolling of the drums caused the ferry to move across the water by "walking" or traveling along the cable, back and forth across the Bayou.

**7.**

When other vessels traveled along the Bayou at that point, it was necessary for one of the ferry's crewmen to release the tension on the cable by unwinding one of the winches, so that the cable would sink to the bottom of Goose Bayou, thus allowing boats to pass without striking the cable.

**8.**

Plaintiff's duties aboard the ferry consisted of mooring and unmooring the ferry, maintaining its engines and machinery, assisting in loading and unloading of the vehicles it transported, cleaning the ferry, operating it on occasions, and operating the shore-based winches in order to raise or lower the cable on which the ferry traveled. All but a small portion of plaintiff's duties were performed aboard the ferry. Plaintiff worked an eight-hour shift, seven days a week, and was paid an hourly wage. He was provided no food or lodging aboard the ferry by his employer.

**9.**

The accident in question occurred on the night of February 25, 1968. Plaintiff's crew, consisting of himself and two other men, went on duty at about 11:00 P.M. Shortly thereafter, plaintiff was instructed to go ashore and take some slack out of the cable on which the ferry traveled. To accomplish this, it was necessary to release the brake lever on the winch and then take up slack in the cable by turning a crank handle on the winch. To prevent a sudden unwinding of the winch when the brake lever was released, a spring-loaded pawl or "safety dog" on the winch "bit" or meshed into the winch gear teeth. When this pawl or "dog" properly meshed with the gear teeth, the winch could not unwind.

**10.**

The area where the winch was located was illuminated by a light from the ferry and also by a light affixed to a pole on shore. The lighting was reasonably adequate except that a nearby tree cast shadows over the winch.

**11.**

Before releasing the brake lever on the winch, plaintiff looked at the pawl

or "safety dog" and it appeared to be in place. When he reached across the winch and released the brake, however, the pawl or "dog" did not engage sufficiently to prevent the winch from unwinding, thus causing the crank handle to suddenly whip around and hit plaintiff's left elbow.

12.

This was the first occasion plaintiff or anyone from his crew had operated the winch on that night. Safe procedure required that the pawl or "safety dog" be set into or enmeshed with the gear teeth. Ordinarily, a spring on the "dog" would pull it into proper position.

13.

Unbeknown to plaintiff, at least two other men had been injured in a similar manner while operating one of the winches.

14.

The proximate cause of plaintiff's injury was the defective or improperly set pawl.

15.

Plaintiff's injuries consisted primarily of an extensively comminuted fracture of the proximal portion of the ulna, with anterior dislocation of the forearm on the elbow. Upon his arrival at West Jefferson General Hospital on the night of the accident, plaintiff was attended to by Dr. Jack Winters, an orthopedic surgeon. The fragmentation in the ulna was so great that it was impossible to reconstitute. The anterior dislocation was reduced, multiple comminuted fracture fragments were excised and the triceps tendon was reattached to the distal ulna. The open wound was closed and a plaster cast applied. Plaintiff remained hospitalized until March 5, 1968, at which time he was released with his left arm still in a cast and kept on antibiotics. The plaster cast was removed on March 19, 1968, and replaced with a splint or half-cast.

Plaintiff was re-hospitalized from May 22 through May 27, 1968, for manipulation and mobilization of a "frozen" shoulder, a complication of his rehabilitation.

Dr. Winters saw plaintiff at regular intervals at his office until his discharge on September 5, 1969. During this period plaintiff received therapy treatments and was instructed to perform certain exercises designed to increase the mobility of his left arm. In the beginning, plaintiff performed these exercises for several minutes each hour he was awake. Later the frequency was reduced to about four times each day.

At trial, Dr. Winters testified that plaintiff had lost approximately fifty per cent of one side of the left elbow joint. Pain and stiffness were severe at first. Analgesics for pain were prescribed for plaintiff until about July, 1968. Rehabilitation was complicated somewhat by adhesions which formed in the shoulder joint, necessitating hospitalized manipulation of the joint. This manipulation resulted in increased soreness and pain in the shoulder for a period of time afterwards. Calcium deposits and scar tissues formed in the elbow joint. Pain in the elbow is to be expected when stress is applied on the joint and also when certain weather changes occur.

At the time of plaintiff's discharge in September, 1969, Dr. Winters was of the opinion his condition had become stable and was not likely to improve any further. He estimated that there was a twenty per cent permanent disability of the left arm. Examination of plaintiff shortly before trial disclosed a moderate degree of atrophy in the left arm, with reduced muscle strength in that arm. There was also a minimal degree of stiffness in the shoulder and hand. Dr. Winters still estimated plaintiff's disability to be twenty per cent.

Dr. Winters further testified that plaintiff could not do a full day of manual labor without suffering persistent pain in his left arm. He would not advise plaintiff to return to any type of

work or activity which would require strenuous exertion of the left arm.

### 16.

Dr. Byron Unkauf, also an orthopedic surgeon, examined plaintiff on one occasion, about a week before trial. He found a ten degree deficiency in rotation of the left elbow, as well as a slight loss of flexion of the second and third fingers of the left hand. Dr. Unkauf also found a one inch atrophy in the left arm, and a two-inch surgical scar. X-rays revealed small fragments in the area of the ulna fracture. There was also some fragmentation of the articular cartilage of the humeral condyle. Dr. Unkauf believed plaintiff had sustained damage to the medial epicondyle, together with a mild ulnar nerve neuritis. He estimated that plaintiff had a twenty-five to thirty-five per cent permanent disability of the left elbow, together with some limitation of rotation of the left forearm. He further testified that plaintiff's condition was not likely to either improve or worsen with time. Dr. Unkauf said plaintiff would experience difficulty and pain in performing manual labor, and would not be able to perform such work satisfactorily.

### 17.

At the time of the accident plaintiff, Urbain Dardar, was 58 years of age. He has had no formal education or training, and cannot read or write except to sign his name. He has no special skills and, before his assignment to the Goose Bayou ferry, worked as a utility laborer for the Department of Highways, primarily cleaning ditches.

### 18.

At the time of the accident, plaintiff was earning approximately $4,550 per year. He had a work life expectancy of slightly more than six years at the time of the accident. Due to accumulated sick benefits and annual leave, plaintiff was paid his full salary until September 3, 1968. All his medical expenses have been paid. The parties have also stipulated that plaintiff has received $2,835 in compensation, which must be credited against any amount plaintiff may recover in this suit.

### CONCLUSIONS OF LAW

#### 1.

■ This matter lies within the admiralty and maritime jurisdiction of the court. "The test of admiralty jurisdiction is the public navigable character of the water, including navigability in fact, no matter how the water originates." Norris, The Law of Seamen (2d Ed. 1962), § 24 at p. 39. "Briefly, the admiralty jurisdiction of the United States extends to all waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable in interstate or foreign water commerce, whether or not the particular body of water is wholly within a state, and whether or not the occurrence or transaction that is the subject-matter of the suit is confined to one state." Gilmore and Black, The Law of Admiralty (1957), § 1–11 at pp. 28–29. See: The Genesee Chief, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851); The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871); United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Goose Bayou is publicly navigable and navigable in fact.

#### 2.

■ The Goose Bayou ferry boat was a vessel in navigation as that term is used under the Jones Act and the General Maritime Law. For purposes of admiralty jurisdiction, Congress has defined a "vessel" as " * * * every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. 46 U.S.C. § 713 defines "vessel" as "every description of vessel navigating on any sea or channel, lake or river * * *." Benedict states that " * * * all are vessels that are manned by a master and crew and are devoted to the purposes of transportation and commerce * * *" Benedict On Admiralty, Vol. I, § 53 at p.

111. "[T]he term 'vessel' is applied to floating structures capable of transporting something over water." Gilmore and Black, The Law of Admiralty (1957), § 1–11 at p. 30; cf. Pleason v. Gulfport Shipbuilding Corp., 221 F.2d 621 (5th Cir. 1955). Whether a particular structure is a vessel turns on its "nature, purpose and character". Atkins v. Greenville Shipbuilding Corp., 411 F.2d 279 (5th Cir. 1969). Even lack of motive power does not deprive a structure of the status of a vessel. Miami River Boat Yard, Inc. v. 60' Houseboat, 390 F.2d 596 (5th Cir. 1968).

In this case, the Goose Bayou ferry floated on water, was intended and actually used to transport people and automobiles over water, and was actively engaged as a vessel in navigation upon navigable waters, rather than as an extension of land.

■ The fact that the ferry traveled along a cable which was anchored to shore does not bring it into the realm of "bridges, piers or other structures extending above navigable waters but permanently attached to the shore or the bed of the watercourse [and therefore] *not within the admiralty jurisdiction of the federal courts.*" Evans v. Louisiana Department of Highways, 430 F.2d 1280 (5th Cir. 1970). Cf. Cookmeyer v. Louisiana Department of Highways, 309 F. Supp. 881 (E.D.La.1970), aff'd 433 F.2d 386 (5th Cir. 1970).

### 3.

■■ The plaintiff, Urbain Dardar, was a seaman or member of the crew of the Goose Bayou ferry since he was more or less permanently assigned to the ferry, performed substantially all of his work aboard the ferry, and contributed to the function of the ferry and to the accomplishment of its mission. Offshore Company v. Robison, 266 F.2d 769, 779 (5th Cir. 1959); Braniff v. Jackson Ave.-Gretna Ferry, Inc., 280 F.2d 523, 526–527 (5th Cir. 1960); Stanley v. Guy Scroggins Construction Co., 297 F.2d 374 (5th Cir. 1961); Producers Drilling Co. v. Gray, 361 F.2d 432 (5th Cir. 1966); Marine Drilling Co. v. Autin, 363 F.2d 579 (5th Cir. 1966); Noble Drilling Corp. v. Smith, 412 F.2d 952 (5th Cir. 1969); Richardson v. St. Charles-St. John Baptist Bridge & Ferry Authority, 284 F.Supp. 709 (E.D.La. 1968); cf. Senko v. La Crosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L. Ed.2d 404 (1957). The fact that plaintiff did not have seaman's papers is not determinative of his status as a seaman under the Jones Act and General Maritime Law. Offshore Company v. Robison, *supra*. Nor is the fact that he was paid by the hour and not provided found by his employer controlling as to seaman status. Richardson v. St. Charles-St. John Baptist Bridge & Ferry Authority, *supra*. Plaintiff had been working regularly on the ferry for more than three months at the time of the accident. His duties directly contributed to the mission or purpose of the ferry, i. e., transportation of people and automobiles across Goose Bayou. Except when he was operating the shore-based winch, plaintiff performed all of his duties aboard the ferry.

■ Moreover, "[t]he fact that [Dardar's] *injury occurred on land is not material.*" Senko v. La Crosse Dredging Corp., 352 U.S. 370, 373, 77 S. Ct. 415, 417 (1957). Recovery under the Jones Act is predicated on the injury taking place "in the course of employment", and the exact place of the injury is not controlling. Crafton v. Tennessee Valley Sand & Gravel Co., 408 F.2d 1096 (5th Cir. 1969) and cases cited therein. Plaintiff's operation of the winch, although on shore, was clearly "in the course of his employment" as a member of the crew of the Goose Bayou ferry.

### 4.

■ The defendant, Louisiana Department of Highways, was negligent in failing to provide plaintiff with a safe place in which to work and with reasonably safe machinery and equipment to perform his duties. The evidence shows that the pawl or "safety dog" on the winch was either moved out of proper

position or was defective in that it did not sufficiently engage with the gear teeth to prevent the winch from suddenly unwinding. At least two other men had been injured in a similar manner while operating one of the winches. The failure of the pawl to properly enmesh with the gear teeth was the proximate cause of plaintiff's injury.

### 5.

 Under the circumstances, plaintiff was not contributorily negligent in failing to discover that the pawl or "dog" was not properly enmeshed before he released the brake lever on the winch. Safe procedure required that the pawl be left in place after the winch was used. Plaintiff testified that he looked at the pawl before releasing the brake, and it appeared to be in place. He cannot be held to have assumed the risk of the unsafe condition. The burden of proving contributory negligence by a preponderance of the evidence was on the defendant, and it has not sustained that burden.

### 6.

 Alternatively, the court concludes that the Goose Bayou ferry was unseaworthy because the winch pawl or "safety dog" was either defective or negligently left out of position for an appreciable length of time. The Fifth Circuit has "specifically rejected the arguments (1) that the doctrine of unseaworthiness applies only to equipment which is part of the traditional gear of a ship and (2) that the doctrine applies only to equipment which is attached to or touching the ship." Law v. Victory Carriers, Inc., 432 F.2d 376 (5th Cir. 1970), citing Deffes v. Federal Barge Lines, Inc., 361 F.2d 422 (5th Cir. 1966); cf. Chagois v. Lykes Bros. Steamship Co., Inc., 432 F.2d 388 (5th Cir. 1970). These cases involve longshoremen injured by shore-based equipment while loading or unloading a vessel. The winch which injured Dardar played a vital part in the navigation and movement of the ferry. It was as much

an appurtenance or appliance of the ferry as was the forklift machine in *Law, supra.* Certainly if longshoremen (*Sieracki* seamen) are entitled to the warranty of seaworthiness while loading or unloading a vessel, then a Jones Act seaman such as Dardar should likewise be afforded the benefit of the doctrine in this case, even though the injury occurred on shore and the equipment which caused the injury was fixed to shore and had never been physically attached to or touching the vessel. The winch pawl was either defective or negligently left out of proper position and, in either case, an unseaworthy condition was created which proximately caused plaintiff's injuries. The shipowner has an absolute duty to provide equipment which is reasonably fit for its intended use. Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941 (1960); cf. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The Department of Highways has failed to fulfill that duty in this case.

### 7.

 Plaintiff is, for all practical purposes, unemployable. Both orthopedists who testified were of the opinion that plaintiff had a significant permanent disability in his left arm and is unable to satisfactorily perform the only kind of work for which he is qualified, i. e., manual labor. He has no formal education or training and has no special skills. Moreover, in view of his age it is unlikely plaintiff could successfully learn a trade or skill. I conclude that plaintiff is permanently disabled and entitled to recover lost earnings for the remainder of his expected work life.

Plaintiff was paid his full salary by the Department of Highways until September 3, 1968. He was earning $4,550 per year at the time of the accident and is entitled to recover past loss of wages to the time of trial. Accordingly, I will

award the sum of $10,830 as past loss of wages.

■ The parties have agreed that plaintiff's work life expectancy would extend to age 65, or approximately three and one-third years from the time of trial. Discounting plaintiff's annual salary for that period of time at four per cent, I conclude that the amount of $14,085 is fair recompense for future loss of earnings.

### 8.

In addition to loss of earnings, plaintiff is also entitled to maintenance at the rate of $8 per day from the date of the accident to the date he reached maximum cure. Dr. Winters testified the plaintiff was discharged from treatment and his condition had become static, on September 5, 1969, some 558 days after the accident. Subtracting the 15 days plaintiff was hospitalized, I find that maintenance is due for 543 days at $8 per day, a total of $4,344. The parties have stipulated that defendants are entitled to a credit of $2,835 for compensation paid to plaintiff.

### 9.

■ As the final item of damages, I hold that the sum of $20,000 will fairly and adequately compensate plaintiff for his past and future pain and suffering.

Since the award of interest in admiralty cases is within the discretion of the court, interest at the rate of five per centum (5%) per annum will be awarded from the date of judgment until paid. All costs shall be taxed against the defendants.

In summary, pursuant to Rule 58, F.R.Civ.P., the Clerk is directed to prepare, sign and enter a judgment in favor of plaintiff, Urbain Dardar, and against defendants in the amount of $46,424, together with five per centum (5%) interest per annum from the date of judgment until paid, and for all costs of this action.