**Eugene N. COOKMEYER**

v.

**LOUISIANA DEPARTMENT OF HIGHWAYS.**

**Civ. A. No. 69–951.**

United States District Court, E. D. Louisiana, New Orleans Division.

Feb. 14, 1970.

Gerald P. Webre, Leonard A. Calcagno, Metairie, La., for plaintiff.

Jesse M. Guillot, New Orleans, La., for defendant.

BOYLE, District Judge:

This suit arises out of an accident that occurred on December 10, 1965, when the plaintiff, while crossing the Paris Road Pontoon Bridge, fell from his motorcycle, allegedly sustaining an injury.

The defendant filed a motion to dismiss and, alternatively, for a summary judgment in its favor, on the ground that the subject matter of this suit is not within this Court's admiralty jurisdiction.

The defendant's motions came on for hearing on January 21, 1970. On the basis of the verified pleadings, depositions, and uncontroverted affidavits submitted and made a part of the record, it appears that there is no dispute between the parties concerning any fact material to the determination of the jurisdictional issue.

On the date of the accident of which plaintiff complains, the defendant maintained and operated, as part of Louisiana Highway 47, a pontoon bridge assembly at the Paris Road crossing of the Mississippi Gulf Outlet and the Intercoastal Canal. This pontoon bridge assembly was a continuation of Louisiana

Highway 47, extending from Chalmette in St. Bernard Parish to the Chef Menteur Highway in Orleans Parish.

The bridge assembly consisted of two steel barges, measuring 120 feet by 30 feet by 7 feet, and 195 feet by 35 feet by 9 feet 9 inches, respectively. The larger barge was fixed between a stationary platform on the South shore, connecting Louisiana Highway 47 to an island approximately in the middle of the Gulf Outlet. The smaller barge spanned the distance between the island and the continuation of Louisiana Highway 47 on the North shore.

The approaches which made up a part of the pontoon bridge assembly were permanent structures attached to the shore of the Mississippi River Gulf Outlet on either side of the bank and of the island.

The two barges which made up a part of the pontoon bridge assembly were each connected to one of two clusters of pilings by a solidly connected steel pivot arm. The pivot arm is shown on Exhibit Highway Department #5[1], which diagram has been made a part of the record. The arm is shown representing its closed position, and its open position. One end of the pivot arm was permanently attached to the side of the barge, and the other end of the steel pivot arm was connected with a collar assembly which was bolted over the timber pile cluster shown in green in Exhibit Highway Department #5. The barge could move from the closed position to the open position on the steel pivoted arm, and was stationary to this pivot arm, pivoting on the pilot pivot by means of two cables, one of which pulled the barge to a closed position, and the other of which pulled the barge to an open position. When the cable was pulled to open or close the bridge, it was pivoted on the steel pivot arm; when the drum pulled the closing cable, the opening cable would be slack; when the drum pulled the opening cable, the closing cable would be slack, allowing the barge to be moved on the pivoting steel arm. As the cables became slack, weights attached thereto brought the cables down to the bottom of the channel. This procedure was performed approximately four times each hour to allow water traffic to pass.

All lights on the pontoon bridge assembly, including the two barges, during the operation by the defendant and, particularly, at the time of the accident, were installed in accordance with the United States Coast Guard regulations for pontoon bridge lighting, and not according to those requirements fixed for barges used as vessels in navigation.

The two pontoons were not at any time during the operation of the bridge detached from the stationary pivot piling structure. During the entire process by which the bridge was opened or closed, the barge-pontoons remained permanently attached to the pivot structure, and were not in navigation.

At the time of the plaintiff's accident, the bridge was in the closed position, accommodating vehicular traffic, as shown in red on Highway Department Exhibit #5.

In oral argument, counsel for both parties have agreed that the plaintiff's injury occurred when the front wheel of his motorcycle struck the metal apron connecting the barge with the stationary platform on the island.

Counsel have further agreed that the primary purpose of the pontoon bridge assembly was to provide an avenue of passage for vehicular traffic crossing the Mississippi Gulf Outlet.

The parties do not dispute these facts concerning the structure on which the plaintiff sustained his injuries. The essential variance between the positions of the plaintiff and the defendant pertains to the character, *sub judice*, of the structure.

1. See copy appended to this opinion and signed for identification by Nathan M. Childs, Engineer.

The contention of the defendant, with which the Court concurs, is that the pontoon bridge is, in fact and in purpose, a bridge, and is, as such, an extension of the land, beyond the admiralty jurisdiction of this Court.

Although such a structure as the Paris Road pontoon bridge has not hitherto been the subject of reported judicial consideration, the jurisprudence provides certain principles which are of general application.

Congress has defined a vessel as including "every description of water-craft or other artificial contrivance used or capable of being used as a means of transportation on water." [2] Benedict's treatise considers purpose to be determinative of the nature of a structure. " * * * all are vessels that are manned by a master and crew and are devoted to the purposes of transportation and commerce. * * *" [3]

■ Clearly, before having become parts of the pontoon bridge assembly, each pontoon may have been a barge in navigation and, hence, a vessel of admiralty cognizance. [4] However, the mere fact that a part of the bridge assembly was at a former time a vessel, or could become, by detachment and adaptation at a future time, capable of navigation, is not dispositive of the issue presented in this case. Whether the pontoon bridge is an extension of land or a vessel turns on its "nature, purpose and character" [5] at the time of the accident which forms the subject matter of this suit.

The primary purpose of the pontoon bridge was to serve as a span connecting North and South shores of the Mississippi River Gulf Outlet, over which vehicular traffic might pass, pending completion of a high level bridge at an adjacent site. It was not intended to ply the navigable waters of the United States, carrying goods and passengers in commerce. When the pontoons were turned on their pivots to allow water traffic to pass, they were performing a function ancillary to the primary purpose of bridging the distance between the two shores. At such times, it should be noted, the pontoons remained attached to the permanent pivot piling structure, and carried no passengers or cargo in navigation. In the light of the function or mission of this special structure, [6] the assembly was a bridge and not a barge. It functioned as a bridge, and was moved through the water only when that function yielded of necessity to the requirements of the Gulf Outlet's water traffic.

In Hayford v. Doussony, [7] the Court held that a structure used and intended for use as a dance platform is not, for maritime lien purposes, a vessel. The platform, formerly a ship in navigation, was secured to the dock with cables and clamps around clusters of pilings. Although it could be detached in the future, it was permanently secured to the dock when used as a dance platform. The Court held that its permanent attachment to shore made what was once a ship in navigation lose its character as a vessel.

Two early decisions of the Supreme Court shed further light on the concepts of primary purpose and permanent attachment in relation to questions of status. The Court held in a salvage case [8] that a dry-dock is not a vessel subject to the laws of salvage. The Court was of

2. 1 U.S.C. § 3.

3. Benedict on Admiralty, Vol. I, § 53, at page 111.

4. Johnson v. C. F. Harms Co., 55 A.2d 165, 25 N.J.Misc. 457, N.J.C.C.P.; Tucker v. Branham, 151 F.2d 96 (3rd Cir. 1945).

5. Atkins v. Greenville Shipbuilding Corp., 411 F.2d 279 (5th Cir. 1969).

6. Offshore Co. v. Robison, 266 F.2d 769, 766, 75 A.L.R.2d 1296 (5th Cir. 1959).

7. 32 F.2d 605 (5th Cir. 1929).

8. Cope v. Vallette Dry-Dock Co., 119 U.S. 625, 7 S.Ct. 336, 337, 338, 30 L.Ed. 501 (1887) ; see also, Atkins, supra note 5.

the opinion that "[a] fixed structure, such as this dry-dock is, not used for the purpose of navigation, \* \* \*. We think no case can be found which would construe the terms [ship and vessel] to include a dry-dock, a floating-bridge, or meeting-house, permanently moored or attached to a wharf."

In a limitation proceeding,[9] the Court held that a wharfboat, used to connect the dock with vessels loading and unloading thereon, secured to shore by four or five cables, and with water, electricity, and telephone connections from the shore, is not a vessel. "It was not practically capable of being used as a means of transportation. \* \* \* It performed no function that might not have been performed as well by an appropriate structure on the land and by a floating stage or platform permanently attached to the land." The pontoon bridge, like the wharfboat and the dry-dock, performs no function that could not be performed at least as well by a more conventional bridge structure. This floating bridge, permanently attached to the approaches on shore, which performs no maritime function, falls within the rationales of both the *Cope* and *Chero Cola* decisions.

The Court of Appeals for the Fifth Circuit noted in a recent statement on status[10] that "mere flotation \* \* \* does not constitute a structure a 'vessel' for purposes of \* \* \* warranty of seaworthiness. The element of risk and

exposure to the hazards of the sea, necessary for the operation of \* \* \* [the principle] is absent upon floating dry docks."

In an earlier case, the Court, in analyzing the application of the doctrine of unseaworthiness, found that "the admiralty doctrine of absolute liability for unseaworthiness is based on protection of seamen who sign articles for a voyage and are then under the absolute control of a master with power to order seamen to do the ship's work \* \* \*."[11] The circumstances surrounding the unfortunate accident on the pontoon bridge in December of 1965 clearly do not coincide with the policy considerations expressed by the Robison court.

■ The accident forming the basis of this suit having taken place on a bridge, this Court lacks admiralty jurisdiction under the premise that a bridge[12] or other structure firmly attached to the land[13] is an extension of land and hence not a subject of the maritime jurisdiction of this Court.

Plaintiff herein is currently pursuing his proper remedy in a state court negligence action.[14]

For the aforementioned reasons, it is the judgment of this court that the motion of the defendant, Louisiana Department of Highways, for a summary judgment in its favor dismissing plaintiff's suit should be, and the same is hereby, granted.

9. Evansville and Bowling Green Packet Co. v. Chero Cola Bottling Co., 271 U.S. 19, 46 S.Ct. 379, 380, 70 L.Ed. 805 (1926).

10. *Atkins*, supra note 5, 411 F.2d at page 283.

11. *Offshore Co.*, supra note 6. Counsel for the plaintiff asserted that the plaintiff's claim on trial would be based on the alleged unseaworthiness of the barge and apron of the bridge assembly. Of course, even if the bridge barge were found to be a "vessel," no duty of sea-

worthiness would be owed to the plaintiff herein.

12. Oakes v. United States, 35 F.Supp. 868 (E.D.N.Y.1940); Jeffers v. Foundation Co., 85 F.2d 24 (2d Cir. 1936).

13. Hastings v. Mann, 340 F.2d 910 (4th Cir. 1965), cert. den. 380 U.S. 963, 85 S.Ct. 1106, 14 L.Ed.2d 153 (1965).

14. Eugene N. Cookmeyer v. Louisiana Department of Highways, No. 456–412, Docket #4, Division "B", Civil District Court for the Parish of Orleans, State of Louisiana.