**LONG ISLAND OWNER'S
ASSOCIATION, INC.,**
Appellant,

v.

**Mark DAVIDSON, John Adams, and
Rebecca Adams, Appellees.**

No. 13–96–249–CV.

Court of Appeals of Texas,
Corpus Christi.

March 12, 1998.

Rehearing Overruled April 23, 1998.

Paul Y. Cunningham, P.T. Moore, Jr., South Padre Island, for appellant.

Joseph M. Nixon, Houston, John Adams, Port Isabel, for appellee.

Before DORSEY, FEDERICO G. HINOJOSA, Jr. and YANEZ, JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

A jury found that a swing bridge owned by appellant, Long Island Owners' Association ("LIOA"), over the Intracoastal Waterway connecting Long Island with Port Isabel is dedicated to the public, that appellees, John Adams and Rebecca Adams, received ser-

vices from LIOA, and that appellee, Mark Davidson, did not receive any services from LIOA. The trial court rendered judgment based on the jury's findings. By three points of error, LIOA complains of no evidence to support submission of the dedication issue to the jury, irreconcilable conflicts in the jury findings, and a defective jury charge. By a fourth point of error, LIOA contends the trial court erred by refusing to grant a permanent injunction barring appellees from using the swing bridge. LIOA requests that we issue a writ of mandamus ordering the trial court to issue such a permanent injunction. We affirm in part and reverse and render in part.

## I. BACKGROUND

The Port Isabel Swing Bridge is a marine barge mounted structure spanning the Intracoastal Waterway between Long Island and Port Isabel in Cameron County, Texas. The first swing bridge was constructed on land owned by the Port Isabel–San Benito Navigation District (the "Navigation District").[1] In 1952, the Navigation District granted an easement to Cameron County (the "County") for construction of the Queen Isabella Causeway connecting the mainland with Long Island and South Padre Island. The County operated the causeway until 1967, when it conveyed the easement to the Texas Highway Department (the "Highway Department"). After completion of a new causeway to replace the existing one, the Highway Department determined there was no public need for the old causeway, ceased maintenance and operation, and reconveyed the easement to the County in 1974. The County then closed the old causeway. Four months later, in March of 1975, the County reconveyed the easement to its original grantor, the Navigation District. On the same day, the Navigation District executed a lease of all the land once covered by the easement, including part of the old causeway and the improvements on the land, including the swing bridge, to John Freeland. Free-

---

1. LIOA's brief states that the bridge was built by Cameron County. However, the easement granted by the Navigation District to Cameron County in 1952 reflects that the bridge already existed and was owned by the Navigation District. We find no evidence in the record showing that Cameron County replaced the bridge.

land, as lessee, was empowered to "operate, repair, construct, reconstruct or remove any and all improvements" then located on the property and to add improvements without complaint from the lessor.

Freeland held the exclusive interest in all of the property on Long Island and planned to develop it. Over the years, he sold acreage to developers and granted the buyers easements over the swing bridge in exchange for periodic cash payments. He canceled the easements of buyers who defaulted on their payments.

In 1985, the condition of the swing bridge had deteriorated to such a point that replacement was essential. Freeland paid for the construction and placement of a new swing bridge. Because of difficulties in financing the operation and maintenance of the bridge, Freeland sold his interest in the leasehold and the bridge to LIOA in 1989.

LIOA was formed and incorporated to purchase, maintain, and operate the swing bridge. Its members include all of the island's property owners with the exception of the residents of Sun Harbor Condominiums ("Sun Harbor"). LIOA assesses contributory shares of all island property owners to offset the costs of maintaining and operating the bridge.

Sun Harbor, where appellees own condominium units, was originally granted an express easement by John Freeland in 1982 in exchange for monthly payments of $1,000. Before declaring bankruptcy, Sun Harbor's developers transferred the obligation for the payments on the easement to the Sun Harbor Homeowners' Association in 1987 or 1988. Despite being advised by the developers that access problems could result, the Homeowners' Association failed to make the payments and Freeland eventually canceled the easement. The residents of Sun Harbor were invited to join LIOA and initially agreed to do so, but Sun Harbor withdrew before the swing bridge was purchased in 1989. John Adams, who purchased two units in 1984, was president[2] of the Sun Harbor Homeowners' Association at that time. No

Sun Harbor resident contributed towards the expenses of maintaining and operating the bridge, despite negotiations between John Adams and Jim Paul, president of LIOA. In 1990, LIOA filed suit against all of Sun Harbor's residents. Davidson purchased his condominium in 1993 with notice of the lawsuit, but without investigating its nature. Except for the appellees, who continue to refuse to participate in the financial aspects of the bridge, all Sun Harbor residents have settled their disputes with LIOA.

## II. OWNERSHIP OF THE SWING BRIDGE

■ The swing bridge has had only three owners. The easement right-of-way granted by the landowner (the Navigation District) to the County in 1952 indicates that the original swing bridge existed prior to the grant and was the property of the Navigation District. The Navigation District still owns fee simple title to the land to which the bridge is connected. The 1975 lease to John Freeland included the swing bridge as an improvement on the leasehold with the proviso that he could remove it and construct a replacement without complaint from the lessor. Because the swing bridge is a leasehold improvement constructed at the lessee's expense and is removable without substantially damaging the leased land, ownership of the improvement rests in the lessee. 51C C.J.S. *Landlord & Tenant* § 394(4) (1968). Freeland conveyed his interest in the bridge and the leasehold to LIOA in 1989. The leasehold includes the appurtenant approaches to the bridge and the roadways.

## III. CHARACTER OF SWING BRIDGE AS PROPERTY

■ LIOA contends the swing bridge is personal property. LIOA argues that the bridge cannot be dedicated because by definition, dedication applies exclusively to real property. *See* 30 TEX. JUR.3d *Dedication* § 1 (1983). The swing bridge is mounted on a floating marine barge moored in the Intracoastal Waterway. It is registered with and

---

**2.** Adams testified he was only a vice-president of the Sun Harbor Homeowners' Association, but all correspondence in the record is addressed to him as the organization's president and reflects his actions as such.

inspected by the Coast Guard as a marine vessel. Therefore, LIOA contends, the bridge is personal property rather than a land structure or real property.

██ A marine vessel is defined by federal admiralty law as "all navigable structures intended for transportation." *Cope v. Vallette*, 119 U.S. 625, 627, 7 S.Ct. 336, 336–37, 30 L.Ed. 501 (1887). Structures as diverse as movable oil drilling rigs mounted on barges, *Guilbeau v. Falcon Seaboard Drilling Co.*, 215 F.Supp. 909, 911 (E.D.La.1963), and car shuttle ferries, *Dardar v. Louisiana*, 322 F.Supp. 1115, 1120 (E.D.La.1971), have been held to be marine vessels as a matter of law. However, the classification of bridges, whether fixed or movable, as marine vessels depends upon the "nature, purpose, and character" of the structure at the time the case arises. *Cookmeyer v. Louisiana Dep't of Highways*, 309 F.Supp. 881, 883 (E.D.La.), *aff'd*, 433 F.2d 386 (5th Cir.1970); *see also Adams v. Harris County, Tex.*, 452 F.2d 994, 995–96 (5th. Cir.1971) (draw bridge mounted on barges).

The character of a bridge very similar to that in the instant case was decided in *Cookmeyer*. The question was whether a swing bridge mounted on pontoon barges was an extension of land or a marine vessel. *Cookmeyer*, 309 F.Supp. at 881. Neither the barges nor the bridge were intended to ply the navigable waters of the United States carrying goods and passengers in commerce. *Id.* at 883. The barges upon which the bridge rested were permanently attached to the shore, resulting in their loss of character as marine vessels. *Id.* The primary purpose of the bridge was to connect the banks of the river and act as an avenue of passage for traffic crossing the river. *Id.* at 882. The court held the fact that the bridge was opened to allow the passage of aquatic traffic on the river was ancillary to its intended function and did not support characterization as personal property. *Id.* at 883.

We find the swing bridge in the instant case to be indistinguishable from the bridge in *Cookmeyer*. Because it functions as an extension of the land to join Long Island with the mainland, we hold it must be characterized as real property.

## IV. DEDICATION

██ "Dedication" is defined as "[t]he appropriation of land, or an easement therein, by the owner, for the use of the public, and accepted for such use by or on behalf of the public." BLACK'S LAW DICT. 412 (6th ed.1990). Dedication may be accomplished by either an express grant or by implication. *Viscardi v. Pajestka*, 576 S.W.2d 16, 19 (Tex. 1978). Generally, an express dedication is accomplished by deed or a written document. *Moody v. White*, 593 S.W.2d 372, 378 (Tex. Civ.App.—Corpus Christi 1979, no writ). Implied dedication, on the other hand, requires showing unmistakable acts on the part of the landowner that clearly establish his intent to donate the land to public use. *Greenway Parks Home Owners Ass'n v. City of Dallas*, 159 Tex. 46, 312 S.W.2d 235, 235 (1958); *Mitchell v. Rancho Viejo, Inc.*, 736 S.W.2d 757, 761 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). In addition to showing the landowner's actions unequivocally demonstrate donative intent, implied dedication requires evidence that the landowner's actions induced the belief that the landowner intended to dedicate the property to public use, that there was an offer and acceptance of the dedication, and there is a public purpose served by the dedication. *Las Vegas Pecan & Cattle Co. v. Zavala County*, 682 S.W.2d 254, 256 (Tex.1984). Only the fee simple holder can dedicate property; a tenant, co-tenant, or non-owner has no power to dedicate, expressly or by implication, a roadway as a public road. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 202 (Tex.1962); *Hudson v. Gaines*, 501 S.W.2d 734, 738 (Tex. Civ.App.—Corpus Christi 1973, no writ); *Dinwiddie v. American Trading & Prod. Corp.*, 373 S.W.2d 867, 869 (Tex.Civ.App.—El Paso 1963, no writ); *Chenowth Bros. v. Magnolia Petroleum Co.*, 129 S.W.2d 446, 447 (Tex.Civ.App.—Dallas 1939, writ dism'd, judg. corr.).

The record reflects the jury was asked to decide only whether the evidence showed unequivocal acts of donative intent. The jury was not asked to find the remaining elements of implied intent.

## V. No Evidence, or Insufficient Evidence, to Support Submission of Jury Question

By its first point of error, LIOA contends there is no evidence, or factually insufficient evidence, of the necessary elements of implied dedication to support submission of a question to the jury on implied dedication. LIOA's motions for directed verdict, to disregard jury findings, for judgment *non obstante veredicto*, and for new trial were all overruled.

■ A complaint that the submission of a certain question to the jury is against the great weight and preponderance of the evidence is completely without merit. *Hinote v. Oil, Chem. & Atomic Workers Int'l Union*, 777 S.W.2d 134, 143 (Tex.App.—Houston [14th Dist.] 1989, writ denied). A trial court bases its decision to submit jury questions on the basis of legal sufficiency, not factual sufficiency. *American Home Assurance Co. v. Brandt*, 778 S.W.2d 141, 144 (Tex.App.—Texarkana 1989, writ denied).

■ In reviewing a complaint that there was no evidence to support the submission of a question to the jury, we look at only the evidence which tends to support the judgment, regardless of whether we apply the standard of review for a directed verdict,[3] the standard for a judgment *non obstante veredicto*,[4] the standard for a motion for new trial,[5] or abuse of judicial discretion.[6] If there is more than a scintilla of evidence to support the jury's finding, we must affirm the trial court's submission of the issue and denial of appellant's motions. *Dowling*, 631 S.W.2d at 728; *Rivera*, 895 S.W.2d at 432; *Strackbein*, 671 S.W.2d at 38.

The jury was instructed to consider the conduct of LIOA and its predecessors, John Freeland and the Navigation District, in deciding whether the swing bridge and its appurtenant approaches and roadways evidenced intent to dedicate the property. The appellees advance different bases for their claims that the bridge is dedicated and do not adopt one another's viewpoints to any significant degree. The Adamses focus their arguments on the activities of the private owners, John Freeland and LIOA. Davidson's argument concentrates on the activities of the Navigation District.

### A. *John Freeland and LIOA*

■ We find no documents in the record showing that either Freeland or LIOA expressly dedicated the land to public use. The issue, therefore, is whether there was a dedication by implication. Accordingly, we must look for affirmative actions or declarations demonstrating a clear and unequivocal intention on the part of Freeland or LIOA to donate the bridge to public use. *Greenway Parks Home Owners Ass'n*, 312 S.W.2d at 235; *Mitchell*, 736 S.W.2d at 761; *McMullen*, 584 S.W.2d at 708–9. Although donative intent can be inferred from actions, *Barstow v. State*, 742 S.W.2d 495, 506 (Tex.App.—Austin 1987, writ denied), it will not be presumed. *Mitchell*, 736 S.W.2d at 761.

■ Appellees ask that we regard the individuals who comprise LIOA as the owners of the bridge and that we consider each member's independent activities as those of LIOA. The record reflects that LIOA is a private corporation. LIOA was formed to acquire the bridge and assure it would remain open by providing adequate funding for maintenance and operations. As a corporation, LIOA is a legal entity separate from the persons who compose it. *See, e.g., Castleber-*

**3.** *Rivera v. Herndon Marine Prod., Inc.*, 895 S.W.2d 430, 432 (Tex.App.—Corpus Christi 1995, writ denied); *Kershner v. State Bar of Tex.*, 879 S.W.2d 343, 346 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

**4.** *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 728 (Tex.1982); *Tubb v. Bartlett*, 862 S.W.2d 740, 745 (Tex.App.—El Paso 1993, writ denied); *Baker v. International Record Syndicate, Inc.*, 812 S.W.2d 53, 56 (Tex.App.—Dallas 1991, no writ); *Boatright v. Texas Am. Title Co.*, 790 S.W.2d 722, 728 (Tex.App.—El Paso 1990, writ dism'd) (*citing*

*Dodd v. Texas Farm Prod. Co.*, 576 S.W.2d 812, 814–15 (Tex.1979)).

**5.** *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984); *Norton v. Martinez*, 935 S.W.2d 898, 901 (Tex.App.—San Antonio 1996, no writ).

**6.** *Texas Dept. of Human Serv. v. E. B.*, 802 S.W.2d 647, 649 (Tex.1990); *McFarland v. Sanders*, 932 S.W.2d 640, 644 (Tex.App.—Tyler 1996, no writ).

*ry v. Branscum,* 721 S.W.2d 270, 271 (Tex. 1986); *Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 374 (Tex.1984). Although LIOA includes almost all Long Island property owners as members, property owned by a corporation is legally the property of the corporate entity, not the members or shareholders. *See, e.g., Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 331 (5th Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Rapp v. Felsenthal,* 628 S.W.2d 258, 260 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). The activity of a member is not the action of a corporation, unless the member is acting on behalf of the company as an agent or officer, *Fidelity & Cas. Co. of New York v. Central Bank of Houston,* 672 S.W.2d 641, 648 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (stockholder's power to elect officers does not mean he possesses authority of an officer), or the corporation is proved to be merely the alter ego of its owners. *Castleberry,* 721 S.W.2d at 272; *Gonzales County Water Supply Corp. v. Jarzombek,* 918 S.W.2d 57, 61 (Tex.App.—Corpus Christi 1996, no writ) (fact that majority or even all of stock in corporation is owned by single person does not of itself make corporation alter ego of individual). Appellees did not allege in their pleadings that LIOA is not a true corporation.

■ After reviewing the entire record, we find no evidence of donative intent on the part of either LIOA or Freeland that would raise an implied dedication fact question for the jury. The evidence shows that members of the general public crossed the bridge without objection from the owner. Standing alone, this is not evidence of donative intent because it is not an unequivocal action. *Greenway Parks Home Owner's Ass'n,* 312 S.W.2d at 241; *Barstow,* 742 S.W.2d at 506.

The public's use of the way and the owner's inaction or acquiescence may, with equal likelihood, indicate either a permissive use by the public, as under a revocable license, or an intention on the owner's part to set the way apart irrevocably for public use. *Barstow,* 742 S.W.2d at 506. There must be evidence of some additional factor that implies a donative intention when considered in light of the owner's acquiescence in the public's use of

the roadway. This additional factor may be any of a variety of things. For example, if a landowner permits public authorities to grade, repair, or otherwise improve the way by exercise of their general control over public streets and highways, this is evidence of intention to dedicate a way to the public. *See, e.g., Lindner v. Hill,* 691 S.W.2d 590, 592 (Tex.1985); *Barstow,* 742 S.W.2d at 506. Another example is where the landowner is shown to have sold parcels of land from a plat or plan showing the roadway as a means of access to the parcels. *See, e.g., City of Fort Worth v. Taylor,* 162 Tex. 341, 346 S.W.2d 792, 794 (Tex.1961); *Adams v. Rowles,* 149 Tex. 52, 228 S.W.2d 849, 851 (Tex.1950); *Birnberg v. Sparks,* 410 S.W.2d 789, 795 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n.r.e.). Other affirmative acts held to demonstrate an implied intent to dedicate a way to public use include construction of facilities for general public use, *Lindner,* 691 S.W.2d at 591 (donor built a public school), an express representation by the owner of a road to a land purchaser that the way is reserved for public use, *Gilder v. City of Brenham,* 67 Tex. 345, 3 S.W. 309, 309–10 (Tex.1887), fencing off the roadway from the remainder of the land, *Owens v. Hockett,* 151 Tex. 503, 251 S.W.2d 957, 959 (Tex.1952), and obtaining a reduction in the purchase price commensurate with the area of the roadway, *Parisa v. City of Dallas,* 83 Tex. 253, 18 S.W. 568, 568–69 (Tex.1892).

■ The record contains no evidence of any similar acts on the part of either LIOA or Freeland. No public funds are used to maintain and operate the swing bridge, the approaches, or the roads. Maintenance and operation expenses are paid solely with private funds. The record contains no plat or development plan for Long Island from which it can be inferred that access to the island via the bridge is assured to land buyers. Testimony established that all of the property on Long Island is privately owned and no public facilities, not even a grocery store or gas station, exist on the island.

Appellees argue that the restaurant operated on the premises of Outdoor Resorts is a public facility. However, appellees concede that Outdoor Resorts is a "restricted-access

community" whose gates are closed and monitored 24 hours a day. Visitors are screened, and the gatekeepers may grant or deny them entry. There is no evidence concerning Outdoor Resorts' admission/exclusion policy.

Davidson did not present any evidence concerning conduct on the part of either Freeland or LIOA that would point to an implied dedication. In closing arguments, the only activity Davidson argued was the permissive use of the bridge by the owners, present and past. As we have previously stated, this alone is not evidence of an affirmative act or declaration.

▮ In their closing argument, the Adamses argued that the signs advertising properties for sale or rent on the island were clear and unequivocal acts on the part of LIOA. Although testimony established that these signs are advertisements for Outdoor Resorts and Sea Cottages, Long Island property developments, no evidence tied the signs to the bridge owners, past or present. LIOA is a legal person, separate and distinct from the natural and legal persons who comprise it. The actions of those legal or natural persons cannot be summarily attributed to LIOA, and we find no evidence in the record showing that LIOA had any connection to their actions. Neither Outdoor Resorts nor Sea Cottages owns the property, and their actions cannot be held to support implied dedication. We find no evidence in the record showing when the signs were erected, or who gave permission for these signs to be erected. There is also no evidence that the signs are on land owned by LIOA or a predecessor. On the contrary, uncontroverted evidence establishes that the signs are located on land belonging to the Walzem Corporation, not LIOA.

▮ Nevertheless, a person who responds to an advertisement concerning commercial activities on Long Island, such as the rental or sale of property, is a business invitee. *Peerenboom v. HSP Foods, Inc.*, 910 S.W.2d 156, 162 (Tex.App.—Waco 1995, no writ); *Texas Power & Light Co. v. Holder*, 385 S.W.2d 873, 885 (Tex.Civ.App.—Tyler 1964), *writ ref'd n.r.e. per curiam*, 393 S.W.2d 821, 822 (Tex.1965). Invitees are an identifiable class of people, distinguishable from the public at large. A business invitee enters onto another's land by invitation for a purpose connected with the owner's business and for the mutual benefit of both parties. *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex.1975); *Ronk v. Parking Concepts of Texas, Inc.*, 711 S.W.2d 409, 411 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.); *see McMullen*, 584 S.W.2d at 709 (noting usage of roadway by landowner, family, friends, guests, and business invitees is not evidence establishing public use as a matter of law).

▮ We find some evidence in the record concerning an attempt by Freeland, in 1987, to obtain permission to charge a toll to use the bridge. Texas law permits owners of private bridges to charge tolls without dedicating their property. *See* TEX.REV.CIV. STAT. ANN. art. 1466–77, *repealed by* Act of April 21, 1995, 74th Leg., R.S., ch. 165, § 24(a), 1995 Tex. Gen. Laws 1025, 1870 (current version at TEX. TRANS. CODE. ANN. §§ 341.002—342.301 (Vernon 1998)) (private corporations may construct and operate roads, causeways, and bridges on private property and collect tolls from public subject only to state regulation on level of toll; no prescribed limit on duration of operation).

John Adams testified that the developer from whom he bought his property assured him there would be no problems with the bridge. He admitted knowing that Freeland, not the developer, was the owner of the bridge. He also admitted that he never received a guarantee of ingress or egress from either Freeland or LIOA. The developer who gave Adams the guarantee held an easement in the bridge, conveyed to him by Freeland, for which the developer was required to pay $1,000 per month. After the developer went bankrupt, the responsibility to pay for the easement was transferred to Sun Harbor's residents through their Homeowners' Association. Because the Sun Harbor Homeowners' Association failed to make any payments, Freeland terminated the easement.

The Adamses' testimony clearly shows that they did not believe the bridge was a public right-of-way. John Adams admitted that he had seriously considered joining LIOA in

1989 because he was interested in controlling the ingress and egress of uninvited people (the general public) to the island, and LIOA was discussing alternative ways to close off the bridge. Ultimately, Adams chose not to join because he was not satisfied with the provisions for insurance coverage on the bridge and issues of control within LIOA. He admitted that LIOA operates and maintains the bridge and roadway, but complained that it was done only for the benefit of a few rather than all of the property owners. Adams did not suggest that the public was entitled to benefit from the continued operation of the bridge; in fact, he complained that uninvited people sometimes crossed the bridge. Clearly, Adams did not believe the bridge was or should be public.

Rebecca Adams testified she had personal knowledge that members of the general public came onto the island, dumped trash on vacant land, and "partied." She did not assert these persons had permission to do so, or that LIOA failed to take measures to stop unauthorized activities of which it was aware. Several witnesses testified that if LIOA was informed that a person was on the island for unauthorized purposes (*e.g.* garbage dumping) it would immediately act to stop it. Rebecca Adams said nothing at all about Freeland.

Freeland testified that for nearly two years after he acquired the leasehold, the bridge was locked in the open position most of the time, making it inaccessible to traffic. There is no evidence of reactionary protest from or action by members of the general public desiring free entry. 30 TEX. JUR.3d *Dedication* § 44 (1983) (public has right to prevent private obstruction of public's free use of dedicated property); *see also, e.g., Dallas Cotton Mills v. Industrial Co.,* 296 S.W. 503, 505 (Tex.Com.App.1927, judgm't adopted).

The record also shows that LIOA has exerted control over access to the island without evidence of public protest. During the nighttime hours, the bridge is blocked by a gate; only island residents and guests are allowed entry. Several witnesses testified that LIOA is working on a plan to extend the hours and means of limiting access. Clearly, LIOA is acting to prevent, not encourage, public access for general purposes. We find no evidence in the record to the contrary.

■ Freeland and LIOA representatives testified that easements or licenses for use of the bridge were granted to certain people. By definition, easements and licenses are inapposite to dedication for public use. Dedication opens a property to use by all members of the public. An easement or license extends the right to use property to only a limited number of people and for certain purposes.

■ Freeland and LIOA representatives stated that the primary purpose in keeping the bridge open was to enhance the value of the land on Long Island, facilitate development, and assure access for themselves and the island's residents, present and future. One resident of the island testified that during Freeland's ownership, the bridge was not regarded as public and he and other residents lived in a constant state of anxiety "because when we went to the bridge we didn't know for sure whether it would be operating or whether it wouldn't." LIOA's acquisition of the bridge alleviated those concerns. Appellees contend this is conduct supporting an implied dedication. We fail to see how an interest in preserving and enhancing the value of and accessibility to private property points to public dedication. Appellees cite no authority for this contention, and after careful review we find none.

B. *Port Isabel–San Benito Navigation District and Right–of–Way Easement*

■ Davidson claims the property, including the bridge, was "dedicated to the public at its inception," *i.e.* by the Navigation District. In support of this claim, Davidson points to a 1952 deed from the Navigation District to Cameron County, granting a right-of-way easement. Davidson contends the easement provides free passage to all people using the bridge forever. During trial, Davidson emphasized one part of the deed and the lack of evidence that the Navigation District ever revoked the easement.

This is a claim for an express rather than an implied dedication because it is based on a written instrument. *Broussard v. Jablecki,* 792 S.W.2d 535, 537 (Tex.App.—Houston [1st Dist.] 1990, no writ); *Moody,* 593 S.W.2d at 378. Neither LIOA nor appellees contend the deed granting the right-of-way easement is ambiguous. During trial, LIOA contended that the easement and any dedication had been extinguished as a matter of law upon abandonment of the property by the grantees and merger of title in the grantor. The parties agreed that questions concerning the easement, *i.e.,* rights created by the deed and extinguishment by merger or abandonment, were questions of law for the court. The parties then asked the judge to examine the documents and decide the matter. The trial court, however, refused to review the documents and said that the issue of the easement and the conduct of all previous owners, including the Navigation District, concerning acts of dedication was a question of fact for the jury to decide. The record reflects the jury was not instructed on the interpretation of legal instruments.

◼ The proper construction of an unambiguous deed is a question of law to be resolved by the court, not the jury. *See, e.g., Luckel v. White,* 819 S.W.2d 459, 461 (Tex. 1991); *Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986); *Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 382 (Tex.1985). A jury may not be called upon to construe the legal effect of an instrument.[7] *Trinity Universal Ins. Co. v. Ponsford Bros.,* 423 S.W.2d 571, 575 (Tex.1968). Appellate courts may review questions of law *de novo* and without deference to a lower court's conclusion. *State v. Heal,* 917 S.W.2d 6, 9 (Tex. 1996); *Matter of Humphreys,* 880 S.W.2d 402, 404 (Tex.1994) (questions of law are always subject to *de novo* review).

◼ The terms dedication and easement are not synonymous. *Russell v. City of Bryan,* 919 S.W.2d 698, 702 (Tex.App.— Houston [14th Dist.] 1996, writ denied). A dedication grants an easement to the general public in the land dedicated for its use. *Wolf*

*v. Brass,* 72 Tex. 133, 12 S.W. 159, 160 (Tex. 1888); *see also Drye,* 364 S.W.2d at 204 (there is no such thing as a private dedication). An easement extends to certain persons the right to use the land of another for a specific purpose. *Magnolia Petroleum Co. v. Caswell,* 1 S.W.2d 597, 600 (Tex. Comm'n App.1928, judgm't adopted); *Miller v. Babb,* 263 S.W. 253, 254 (Tex. Comm'n App.1924, judgm't adopted). Neither a dedication nor an easement conveys title to the property. *Magnolia Pet. Co.,* 1 S.W.2d at 600 (easement); *Humble Oil & Refining Co. v. Blankenburg,* 149 Tex. 498, 235 S.W.2d 891, 893 (Tex.1951) (dedication). The use of the word "right-of-way" in conjunction with "easement" delineates the scope and purpose of the grant. *Lakeside Launches, Inc. v. Austin Yacht Club, Inc.,* 750 S.W.2d 868, 871 (Tex.App.—Austin 1988, writ denied). We conclude that the only reasonable reading of "easement and right-of-way" in this grant is one in which the term "right-of-way" is used to mean right-of-passage over and across all the land described in the instrument, without a conveyance of title from the Navigation District to the County.

◼ There are two types of easement: in gross and appurtenant. An easement appurtenant attaches to the land and passes with it, while an easement in gross is personal and attaches only to the grantee. *McDaniel v. Calvert,* 875 S.W.2d 482, 484 (Tex. App.—Fort Worth 1994, no writ). Where the court can fairly construe an easement to be appurtenant to some other estate, an easement in gross will never be presumed because easements in gross are not favored. *Walchshauser v. Hyde,* 890 S.W.2d 171, 173 (Tex.App.—Fort Worth 1994, writ denied); *Stuart v. Larrabee,* 14 S.W.2d 316, 319 (Tex. Civ.App.—Beaumont 1929, writ ref'd).

◼ The Navigation District granted the County full power to convey the easement to the State of Texas and made the conditions in the original grant binding to the grantee's successors in interest. As a result, the easement ran with the land and therefore the

---

7. The jury charge and questions contain no instructions or definitions regarding the assorted

instruments of conveyance in the record.

parties created a right-of-way easement appurtenant. *Shipp v. Stoker*, 923 S.W.2d 100, 103 (Tex.App.—Texarkana 1996, writ denied).

Following the legal description of the land and a recitation of the purpose of the easement, the instrument recites further consideration given by the grantee in exchange for the easement. Davidson contends the language of the consideration agreement created a perpetual right-of-way for the public. The paragraph reads:

It is expressly understood, agreed and stipulated, that as part of the consideration for the easement herein granted to Cameron County, the Port Isabel–San Benito Navigation District, the grantor herein, its officers, employees, agents, tenants, licensees, successors in title, and all persons now or in the future having or doing any business of any nature whatsoever with grantor, shall have, together with all owners, their employees, agents, tenants, licensees, and persons having or doing business with such owners of any industry and/or business enterprise of whatsoever nature that may be established and/or operated on any land now owned by grantor herein lying South of the Intracoastal Canal in Patent No. 333 issued by the State of Texas, the full and free right of liberty at all times hereafter to pass and repass on foot or in vehicles from the mainland to and from said lands and any part thereof, by way of the Causeway, including the swing barge bridge or any type of structure that may be erected and used for transportation purposes in place of such swing barge bridge, and such right of passage shall be without any charge of any nature whatsoever. This free right of passage is and shall be binding upon the County of Cameron, Texas, its successors and assigns, and upon the State of Texas and any department or agency thereof, and upon any person, persons, corporation or corporations that may at any time own or operate said causeway and any structure forming a part thereof crossing the Intracostal [sic] Canal.

We conclude that the easement right-of-way does not effect an express dedication. We interpret the language relied upon by Davidson to be a promise by the easement grantee to permit free, unencumbered passage only to the classes of people enumerated by the grantor. By distinguishing and listing these classes at length rather than simply declaring that access would be open to the general public, it is clear the Navigation District did not expressly dedicate the property.

Furthermore, a thorough review of the record reveals that the causeway was not free to all users. When the County operated the swing barge bridge as part of the Queen Isabella Causeway System, it charged a toll to cross the bridge. Finally, Davidson presented no evidence showing which, if any, of the privileged classes listed include him. Davidson argued entitlement simply as a member of the general public.

No witnesses testified concerning any actions by the Navigation District that could be considered evidence of dedication. We, therefore, will review all the documents in the record to determine if there was a dedication and whether, as LIOA argues, any dedication was terminated as a matter of law.

After acquiring the easement and building the causeway, the County operated the Queen Isabella Causeway System on the property until 1967. The County then transferred its interest in the easement to the Texas Highway Department. When a new causeway was opened between Port Isabel and Padre Island in 1974, the Texas Highway Department declared there was no further public need for it to continue maintaining and operating the old causeway. At the request of the County, the Highway Department reconveyed all of its interest in the easement and the old causeway to the County in 1974. Shortly thereafter, on March 24, 1975, the County reconveyed all of its interest in the easement to the Navigation District, the original grantor. The County also conveyed all of its interest in land adjacent to the Navigation District's land, over which the easement had been granted, and the County's interest in the old causeway. Afterward, on that same day, the Navigation District leased the property with its improvements to John Freeland, a private individual. The two instruments cannot be taken as parts of the

same contract because the parties to the easement and the lease are not the same. *Cf. Jackson v. Overton,* 18 S.W.2d 773, 775 (Tex.Civ.App.—Amarillo 1929, writ ref'd).

An easement appurtenant is extinguished when unity of title is effected because a landowner cannot have an easement in his own land. *See Hidalgo County Water Control & Improv. Dist. No. 16 v. Hippchen,* 233 F.2d 712, 714 (5th Cir.1956); *Reeves v. Towery,* 621 S.W.2d 209, 213 (Tex. Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); *Magnolia Pet. Co.,* 1 S.W.2d at 600. The County's unreserved reconveyance of all its interest in the easement coupled with the simultaneous sale of "its interest in an additional land mass adjacent [to the land covered by the easement] as constructed in connection with the building of said causeway, and the first 920 feet of said causeway system" as well as "all the rights, title and interest which [the County] now owns and holds by virtue of any and all conveyances heretofore made to Cameron County" resulted in the merger of interests. *See Banker v. City of Groves,* 295 S.W.2d 548, 550, 551 (Tex.Civ.App.—Beaumont 1956, writ ref'd n.r.e.) (reconveyance of easement terminated party's interests connected with easement); *Boiles v. City of Abilene,* 276 S.W.2d 922, 925 (Tex.Civ.App.—Eastland 1955, writ ref'd) (implying reconveyance of right-of-way to grantor results in extinction). When an estate in fee and an easement on the land are held by the same owner, the easement is extinguished because all subordinate and inferior derivative rights are necessarily merged and lost in the higher right. 28A C.J.S. *Easements* § 123 (1996).

Careful reading of the document reveals that the specific purpose of the easement was for "opening, constructing and maintaining a permanent causeway from the mainland to Padre Island" and to permit the County access "for the purpose of making additions to, improvements on and repairs to the causeway or any part thereof." The causeway system included the swing bridge.

LIOA correctly informed the trial court that although the old causeway system was used by the public for many years, the system was closed and legally abandoned in 1974. After closing the swing bridge, the state intended to sell it to a salvager for scrap.[8] The County asked the Highway Department to reconvey the easement back to the County, and the Highway Department complied with the request. Under the law at that time, a declaration that a right-of-way was no longer needed by the public coupled with reconveyance to the grantor upon request of the County where the property lay effected an abandonment. *See* Tex.Rev.Civ. Stat. Ann. art. 6673a, *repealed by* Act of April 21, 1995, 74th Leg., R.S., ch. 165, § 24(a), 1995 Tex. Gen. Laws 1025, 1870 (Vernon 1995) (current version at Tex. Trans. Code § 202.021 *et seq.* (Vernon 1998)). After the Highway Department relinquished its interest in the Queen Isabella Causeway System, the County closed the causeway system. Within four months, the County's interest in all parts of the system, including the causeway, the swing bridge, and the approaches, were relinquished to the Navigation District. By closing the public road and conveying the easement back to the original grantor, the County abandoned its interest as a matter of law. *See* Tex.Rev.Civ. Stat. Ann. art. 6702–1, § 2.001 *et seq., repealed by* Act of April 21, 1995, 74th Leg., R.S., ch. 165, § 24(a), 1995 Tex. Gen. Laws 1025, 1870 (Vernon 1995) (current version at Tex. Trans. Code § 251.051 *et seq.* (Vernon 1998)). The language in the County's deed clearly constitutes a permanent relinquishment of all interests in the causeway system.

According to the deed, the County sold, transferred, and conveyed back to the Navigation District "all the rights, title and interest which the County of Cameron now owns and holds by virtue of any and all conveyances heretofore made to Cameron County[.]" The deed concludes with a declaration that the property was being conveyed "[t]o have and to hold unto the Port Isabel–San Benito Navigation District, its successors and assigns forever." Nothing was retained except an easement for a water line. Because

---

8. The sale was canceled when Freeland sought to obtain title to the swing bridge in order to pre-

serve access to his property on Long Island, which he held in its entirety.

the Navigation District granted a leasehold interest to a private person on the same day that it recovered full rights to the causeway system, it is clear the Navigation District had no intention of maintaining or operating it for public use.

■ If an easement is granted for a particular purpose only, the right to use the property ceases when the specified use ceases. *Woodmen of the World, Camp No. 1772 v. Goodman,* 193 S.W.2d 739, 741 (Tex.Civ. App.—Dallas 1945, no writ), *accord, Shaw v. Williams,* 332 S.W.2d 797, 800 (Tex.Civ. App.—Eastland 1960, writ ref'd n.r.e.). With the completion of the new causeway and the cessation of maintenance and operation of the old causeway system by the state, the purpose for the old Queen Isabella Causeway System ceased. *Cf. Shaw,* 332 S.W.2d at 800 (cessation of need for reservoir, for which purpose easement was created, extinguished easement). The record shows an unequivocal declaration by the state that no public purpose remained. Testimony established that the old causeway long ago fell into disrepair, was fenced off, declared unsafe for vehicular traffic, and is presently condemned.

■ The right of the public to use a public highway can be relinquished following abandonment. Where a highway has been lawfully discontinued it may not be reestablished without setting aside the discontinuance or making a new statutory establishment or a new dedication by the owner. 39A C.J.S. *Highways* § 130 (1976); *Woolaver v. Texaco, Inc.,* 638 S.W.2d 153, 155 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.). A member of the public who wished to keep the road and bridge open for public use, despite the statutory abandonment, could have brought suit against the County. *See* TEX.R. CIV. STAT. ANN. art. 5526a, *repealed by* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 9(1), 1985 Tex. Gen. Laws 3242, 3322 (current version at TEX. CIV. PRAC. & REM.CODE § 16.005 (Vernon 1997)). However, we find no evidence in the record of a suit filed within the two-year statute of limitations. *See id.*

The lease agreement between John Freeland and the Navigation District notes that a 1973 lease to King Christopher Isle, Inc., an assignee of Freeland's, was made subject to the right-of-way easement. The lease then recites the events recounted above which legally terminated the easement. The clause granting the lease to John Freeland in 1975 does not mention the easement right-of-way. The legal description of the property covered by the leasehold expressly mentions three easements, excluding the easement right-of-way, but including the water line easement reserved by the County. The consideration agreement is for ten dollars "and other good and valuable consideration to [grantor] in hand paid by [grantee]." There is no evidence concerning the other consideration, and mere speculation cannot substitute for evidence. Furthermore, the easement right-of-way terminated before this lease was executed.

■ A terminated easement is not revived by a subsequent separation of ownership interests. 28A C.J.S. *Easements* § 123 (1996); *see also Zerbey v. Allen,* 215 Pa. 383, 64 A. 587, 587 (1906). A new grant of the former dominant estate to another will not carry with it the former incidents of such estate unless reestablished by the force of the grant itself by such words of description as could bring them into being by way of a new grant. *See Robinson v. St. John's Guild,* 197 A.D. 260, 188 N.Y.S. 844, 844 (1921). We find no language in the lease to imply a reestablishment of the easement. Accordingly, we hold that the leasehold is not burdened by the extinguished easement.

### C. *Conclusion on Dedication*

Because we find no evidence of unequivocal acts or declarations by any owner of the bridge, we hold there is no implied dedication of the bridge to the public. Because we find no written instrument creating an express dedication, we hold there is no express dedication of the bridge to the public. We also hold that any public right to use the bridge, which once existed, was extinguished forever as a matter of law in 1976. We, therefore, sustain LIOA's first point of error.

By its third point of error, LIOA complains that neither the jury charge nor the special question contained all of the essential

elements necessary to support a finding of implied dedication by the jury. We agree. However, because we have sustained LIOA's first point of error, we need not address this point.

## VI. IRRECONCILABLE CONFLICT IN JURY ANSWERS

By its second point of error, LIOA contends there is irreconcilable conflict among the jury's answers to three questions. Besides being asked if the bridge's owners had dedicated it to the public, the jury had to decide if LIOA, by operating the bridge, had performed compensable services for the appellees and, if so, what the value of those services was. The jury found that only the Adamses had received benefits from LIOA and that the value of those services was $2,000, much less than LIOA had sought.[9] LIOA argues the jury's findings, that LIOA performed compensable services for the Adamses and that the bridge was dedicated to the public, are irreconcilable because it is illogical to find LIOA's operation and maintenance of the bridge resulted in compensable services to the Adamses, but not to Davidson, or to the general public.

LIOA does not complain of the jury's finding that LIOA was not entitled to compensation from Davidson. We, therefore, will not address that finding.

 In reviewing jury findings for conflict, the threshold question is whether the findings are about the same material fact. *Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980). It is our duty to harmonize jury findings whenever possible. *Id.* The jury's answers cannot be struck down if there is any reasonable basis on which they can be reconciled. *Id.* The reviewing court must reconcile apparent conflicts "if reasonably possible in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole." *Id.* In order for conflicting findings to destroy each other, one finding must be such that it would warrant judgment for one of the parties, and the other finding

would warrant judgment for the other party. *Grice v. Hennessy*, 327 S.W.2d 629, 633 (Tex. Civ.App.—San Antonio 1959, no writ); *Woodard v. Tatum*, 277 S.W.2d 943, 945 (Tex.Civ. App.—Waco 1955, no writ). Irreconcilable conflict is fatal, fundamental error requiring the judgment to be set aside. *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 991 (1949).

In one question, the trial court asked the jury: "Did Long Island Owners' Association perform compensable services for John and Rebecca Adams?" The trial court instructed the jury: "One party performs compensable services if these services confer a benefit on another party who knowingly accepts them and if the party accepting them should have known that the performing party expects to be paid for the services." The jury answered "yes."

In a second question, the jury found that fair and reasonable compensation for services rendered between April 15, 1989 and August 29, 1995 was $2,000. In a third question, the jury found that the swing bridge was absolutely and unequivocally dedicated for public use.

The findings appear to fatally conflict because one cannot reasonably be expected to pay damages to a private entity for the use of a public structure. However, we have determined that the swing bridge is a private structure and not dedicated to the public.

The evidence presented to the jury concerning damages was sparse and conflicting. LIOA informed the jury how it assessed each property owner's share of operating and maintenance costs. LIOA explained that John Adams' assessment was $5,831.49 because he owned two condominium units and eight boat slips on Long Island. John Adams, however, testified he owned two condominium units and two boat slips on Long Island.[10] The jury found that Adams should pay $2,000 as compensation for services rendered.

As fact finder, the jury is the exclusive judge of the credibility of the witnesses and

---

9. LIOA had asked for $5,831.49.

10. At first, Adams testified he had "several" slips.

the weight to be given their testimony. *Silva v. Enz*, 853 S.W.2d 815, 817 (Tex.App.—Corpus Christi 1993, writ denied). In resolving contradictions and conflicts, the jury may choose to believe all, part, or none of the testimony of any one witness in arriving at the finding it determines is the most reasonable under the evidence. *Id.*

Because we have determined the swing bridge is a private structure, not dedicated to the public, we conclude that the jury's finding is reconcilable as compensation for the use of privately-owned property. We overrule LIOA's second point of error.

## VII. PERMANENT INJUNCTION

By its fourth point of error, LIOA complains that the trial court abused its discretion by refusing to grant a permanent injunction barring appellees from using the swing bridge. LIOA contends there is no legal remedy available to it to compel appellees to share in the expenses of operating and maintaining the swing bridge. LIOA requests that we issue a writ of mandamus ordering the trial court to issue the permanent injunction.

Because the express grant to Sun Harbor residents terminated before 1989, appellees have no express easement in the bridge. By pressing this suit and seeking to bar appellees entirely, LIOA has unequivocally revoked any license for appellees to use the bridge.

An injunction is a pure application of equitable relief. One seeking injunctive relief must plead and prove that he has no adequate remedy at law and that irreparable injury is threatened. *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 472 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Inman v. Padrezas*, 540 S.W.2d 789, 797 (Tex.Civ.App.—Corpus Christi 1976, no writ). The grant or refusal of a permanent injunction is within the trial court's sound discretion and, on appeal, review of the trial court's action is limited to the question of whether the action constituted a clear abuse of discretion. *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex.1979).

Mandamus is an extraordinary remedy, not issued as a matter of right, but at the discretion of the court. *Rivercenter Assoc. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993). Although mandamus is a legal remedy, its issuance is largely controlled by equitable principles. *Id.* It will lie only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no adequate remedy at law. *Walker v. Packer*, 827 S.W.2d 833, 841 (Tex.1992, orig.proceeding); *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). It is not appropriate when other relief would be effective and complete. *Montalvo v. Fourth Court of Appeals*, 917 S.W.2d 1, 2 (Tex.1995); *Walker*, 827 S.W.2d at 840; *Corpus Christi Caller–Times v. Mancias*, 794 S.W.2d 852, 854 (Tex.App.—Corpus Christi 1990, mand. overr.).

After reviewing the record, we believe that LIOA has a legal remedy available to compel appellees to share in the expenses of operating and maintaining the swing bridge. We cannot say that the trial court abused its discretion by refusing to grant LIOA's request for a permanent injunction. Accordingly, we overrule LIOA's fourth point of error and deny its request for a writ of mandamus.

We reverse the judgment of the trial court that the Port Isabel Swing Bridge and its appurtenant approaches and roadways were dedicated for public use. We render judgment that the Port Isabel Swing Bridge is a private structure and that the bridge and its appurtenant approaches and roadways are not dedicated for public use. We affirm the remainder of the trial court's judgment.