John HATTON, Nelton Brooks, Mary J. Brooks, Bennie Ann Henry, Fort Bend Heritage Society A Texas Corporation, Easter Spates Holmes, William Louis Carlton Holmes III, Phylis Spates Gales and Victor Gales, Appellants,

v.

Daniel D. GRIGAR, Appellee.

No. 14-00-00895-CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 17, 2002.

John B. Harle, Bellville, for appellants.

Don T. Schwartz, Rosenberg, for appellees.

Panel consists of Chief Justice BRISTER and Justices FOWLER and SEYMORE.

## OPINION

WANDA McKEE FOWLER, Justice.

This is an appeal of the trial court's judgment declaring the existence of a public road and an easement by necessity, prescription and implication in favor of appellee Daniel D. Grigar. Appellants contend that the evidence is legally and factually insufficient to support the trial court's findings that (1) a public road exists over the appellees' land, (2) a prescriptive easement exists over appellees' land in favor of Grigar, and (3) an easement by implication and necessity exists over appellees' land in favor of Grigar. Appellants also challenge the trial court's award of attorney's fees to Grigar. Appellee asserts a cross-issue in further support of the judgment. For the reasons stated below, we affirm.

## PROCEDURAL HISTORY

The road at issue is a gravel road that runs from State Highway 36 toward the Brazos River in Fort Bend County. The road is perpendicular to Highway 36, which runs east and west. The road ends before reaching the Brazos river to the north. Appellant John Hatton's property lies just north of Highway 36 and west of the road. Grigar's property lies just north of Hatton's. The properties of the other appellants are located on the east side of the road.

In 1997, after a dispute with Hatton over the use of the road, Grigar sought a declaratory judgment that the road was a public easement of ingress and egress, and asserted that an easement existed by implication, estoppel and prescription. Following a bench trial, the trial court entered a judgment in favor of Grigar that (1) a public road exists and that it contains 0.899 acres (as described in an attached survey); (2) the Grigar land is land-locked; (3) an easement by necessity, prescription, and implication exists in favor of Grigar; and (4) Grigar is entitled to recover, jointly and severally from the defendants, attorney's fees of $8,500 for the services rendered through trial, costs of $3,500, and $4,000 in the event of an unsuccessful appeal to the court of appeals.[1] Findings of fact and conclusions of law were not requested. This appeal followed.

## FACTS

At trial, the court heard from numerous witnesses, including Daniel Grigar, members of Grigar's family, defendants Hatton and Nelton Brooks, other individuals who owned or had owned property in the area, and two land surveyors. The first witness called by Grigar was Charles Kalkomey, a local land surveyor and licensed profes-

---

1. Several of the named defendants are not identified in the appeal. They are Matthew Draper, Lizzie Draper, Lucius Henry, Deidre Ann Henry, and Donald Earl Henry.

sional engineer. He prepared two alternative surveys of the road for the court's consideration. One spanned from fence line to fence line on either side of the road (0.899 acres), and the other spanned from the boundaries of the Hatton and Grigar properties on the west across to the east side of the road (.0.729 acres). Kalkomey testified that all of the defendants' properties abut the road. He also testified that several deeds he had reviewed identified the road.[2] A 1959 deed that partitioned a tract of land (known as the Ross tract) into several adjoining properties identified a passageway for access to the properties from Highway 36 that connected to a road on an attached sketch, and Kalkomey opined that the sketch portrayed the road at issue.[3] He also opined that the deeds he reviewed reflected an intent to provide an access road to the properties from Highway 36. Kalkomey testified that, despite researching the origin of the road, he was unable to find any official designation or dedication of any kind of roadway in the deed records other than the references to the existing road or easement.

Kalkomey also opined that, based on a 1971 survey prepared by his father, the road at that time was a public road that was surfaced and accessible. However, he did not actually see the road himself until he performed a survey in the area in 1983, and he did not know who maintained it. He confirmed that when he saw the road,

it was fenced on either side, although some fencing was missing at the northern end. He also testified that at one time, the Grigar and Hatton properties were one parcel, but were separated into tracts as early as 1898. The 1898 conveyance did not include an easement, nor did the subsequent conveyances to Hatton in 1973 and 1974.

Glenn Grigar, a cousin of appellee, testified that he was familiar with the road because in the 1950's 60's he and his father used the road to deliver groceries from his father's store in Wallis, Texas to customers in the area. He also traveled on the road to place landfill in a large gully located on what is now appellee's property. He testified that the road had the reputation of being a public road, and that it was never closed off or barricaded. He further testified that the character of the road had remained the same to the present, and that he has never been denied access to the road. Finally, he testified that the road was the only access road from appellee's property to Highway 36.

Appellee next called Franklin Schodek, a land surveyor who testified that he had prepared surveys in the area in the past. Schodek agreed that the passageway depicted in the Ross deed was a road, but he did not know if it was public or private. He stated that in his opinion, a public road

2. Some of the deeds Kalkomey reviewed are not in evidence. However, Plaintiff's Exhibit 5, a deed of 2.42 acres to Fort Bend Heritage Society, references land "including 0.42 acres in a 30 foot wide private road along the West and South lines of said 2.42 acres, SUBJECT TO a right of way and easement for free and uninterrupted passage along a strip of land 30 feet in breadth on said 2.42 acres adjoining and extending the entire lengths of the West and South lines of the 2.42 acres herein described for the use and benefit of Grantors, their heirs and assigns."

3. The 1995 deed of property from Jewerl Ross to appellee references the 1959 Ross deed, providing that the conveyance includes "all our interest in that easement and roadway along the East Side of Blocks 3, 4 and 5 of the William Jones Subdivision in the Shelby, Frazier and McCormick League, Abstract 85, Fort Bend County, Texas, which road runs adjacent to the West line of the Tom Hatton Estate ... and our interest in that 25 foot passageway shown on Memorandum Sketch attached to Deed of Partition dated August 29, 1959, between Tom Ross et al....."

was one maintained by the county, and he had no evidence that the road at issue was maintained by the county.

Grigar's next witness was Jewerl Ross. Ross had previously lived on the property he sold to Grigar. Ross, who was born in 1911, testified that he was familiar with the road because he had lived in various places in the area for 20 years. When he was a young boy, the road was open to the Brazos river. Families who lived north of the river would cross the river in a boat or, if the river was very low, on horseback or in a wagon and use the road. He testified that children who lived north of the river would cross the river and travel down the road to go to a school that was located across Highway 36. Ross also traveled the road to go to the school. He also testified that the road was never closed. His testimony reflected that the people who had property there used the road, and that the road had the reputation of being a public road to the farmers that owned property on each side of the road. On cross-examination, Ross admitted that his recollection was from 68 years ago. He also had no knowledge of the county maintaining the road during that time.

The court then heard the testimony of appellee, Daniel Grigar. He testified that he was familiar with the road because he grew up in the area. He recalled that, when he was a boy in the 1950's, he used the road to get to the river to go fishing. After he got his driver's license in 1961, he drove down the road to take a friend of his mother to her home. In 1972, his father, Albert, purchased property in the area for farming, and appellee would travel the road to get to the farm. He explained that at one time, there was another access road that went through an adjoining property Albert leased, and that they moved their farming equipment on that road because it was safer than taking the farming equip-

ment on the highway. Once the adjoining property was sold, however, the road at issue became their only access to Highway 36. Grigar testified that he had never had to ask permission to use the road, and had never been denied access to it for twenty-plus years. When asked whether he thought the road was a public road, he stated that "[a]s far as I know, anybody that wanted to travel that road traveled that road."

Grigar testified that he purchased his property from Jewerl Ross in 1995, and acquired his parent's interest in their property in 1996. After he acquired Ross's property, he had a conversation with Hatton in which Hatton told him not to use the road. On cross-examination, Grigar admitted that he had never personally maintained the road. Further, while he had seen people travel the road to go fishing, he could not say that he observed it on many occasions. He testified that when he purchased his property, Ross told him there was a right of way to the property, and Grigar took his word for it. He did not engage a title company or get title insurance on the property.

The next witness, George Cooper, was a resident of Wallis, Texas, who knew the Grigars because he had hauled dirt from their property for several years in either the late 1970's or early 1980's, and had graduated with the Grigar's son, Carl. Cooper testified that he thought the road was for public use then, and he had the same opinion of the road now. He stated that he had never had to get permission to use the road, knew of no one who did, and was never stopped on the road. He never saw the county or city maintaining the road, but thought that the people who lived in the area had gotten someone to work on it. Cooper further testified that he had seen other cars on the road, but did not notice who was in them and did not

know why they might be traveling on the road.

Josefine Grigar, appellee's mother, testified that she and her husband purchased property in the area from Ross in 1972, and used it for planting hay, corn, and soybeans. They used both the road at issue and the other access road through the property they leased for the farming equipment. They continued to use the property for several years. After her husband passed away in 1983, she continued to farm it with the help of her son. She testified that she had seen other people traveling on the road, both strangers and people she knew. She stated that some of them went to pick dewberries or grapes, or went to the river to fish.

Carl Grigar, appellee's brother, testified that he never had to get permission to use the road, and knew of no one who did. He stated that the road was fenced on either side, although some of the fence was down. He also testified that he had seen tractors, trucks, and all kinds of vehicles use the road, and that people in former years sometimes dumped trash on his parent's property because there was a gully there. He testified that he got a call from Hatton in 1996, in which Hatton told him not to use the road. He also testified that Hatton made accusations and threats during the call, but Grigar did not call the police about them. He admitted that the Grigars had never paid anyone to maintain the road, but stated that they maintained it by "shredding" the road, meaning cutting the grass on either side. He admitted they did not bring in gravel or fix any potholes.

Grigar's attorney then testified to his attorney's fees, and then rested his case subject to his examination of Hatton. At that time, both parties asked for directed verdicts, which the trial court denied.

The defense then presented Charles Spates, the older brother of appellees Phy-lis Spates Gales and Easter Spates Holmes. Spates testified that his family once owned property across from the Hatton property that was used for farming. This property was now owned by appellee, Fort Bend Heritage Society. Spates testified that his father used to have cars parked on the property from which he sold parts. His father at one time enlarged the road so that trucks could more easily turn around on it, and later the road was jointly maintained with the Hattons. Further, the county never maintained the road. Spates also testified that the road was never a public road, and that everyone in the community would ask his father's permission to use the road.

Nelton Brooks, one of the appellants, testified that he acquired his property in 1987–88. Prior to that, his parents had lived on the property, and he visited them periodically. He did not live on the property, but would travel to it on weekends. He further testified that the road was never a public road, and he never gave anyone permission to use the road. He also stated that the county never maintained the road. The next witness, Earl Henry, testified that he had lived in the Wallis area his entire life, and that his children, defendants Deidre Ann Henry, Donald Earl Henry, and Bennie Ann Henry, had gotten their properties from him. Like Brooks, he testified that the road at issue had never been a public road. He also confirmed that the Hattons, not the county, maintained the road.

Appellant John Hatton was the next witness. He testified that he acquired his ten-acre tract in 1973 or 1974, and confirmed that the road was adjacent to his property. Hatton further testified that in 1996, Brooks and others deeded to him some property and an easement including 30 feet of the road in question; however, previously, his control over the use of the

road was based on a verbal representation that he merely made "official" in 1996. He stated that the road was not a public road, and that he had always maintained the road since he owned the property. He also stated that the Brooks, Mrs. Bates, and the Henrys worked with him to maintain the road. Hatton testified that he had refused permission to use the road on many occasions, including once when he stopped George Cooper from hauling dirt on the road. He further testified that he never gave the Grigars permission to use the road prior to 1996.

On cross-examination, Hatton admitted that he used the road for purposes of his salvage business before he moved it elsewhere, and admitted that a sign in a photograph depicting "Hatton Auto Salvage—Buy–Sell–Trade—Used Parts" was his sign. He also stated that he put up a gate across the road and put a lock on it. He explained that he had problems with Albert Grigar, appellee's father, since he purchased the land in the 1970's, but stated that he did not have problems with the Grigars using the road until 1995. He testified that he told them not to use the road, but they did so anyway. On further cross-examination, Hatton explained that he did not know Daniel Grigar personally and had no problems with Josefine Grigar, but if he let them use the road, then Carl and Albert Grigar, Jr. would use it also, and they would cause problems. Hatton admitted that the property owners on the east side of the road had the right to use the road, and he had no choice about it.

On redirect, Hatton denied speaking to or making threats to Carl Grigar. He also testified that there once was a gate at the entrance to the road, but it was opened in the 1970's when Brooks bought his property. The road was only open to family members. Hatton further testified that there were no grocery stores, hospitals, farmer's markets or amusement parks on the road. He also stated that there was a road that went by a church in the area that the Grigars could use to access their property as they had done in the past.[4] In response to questioning from the court, Hatton admitted that the road did not go all the way to the Grigar property, and the Grigars would have to cross pasture land to reach their property.

After the defense rested, Grigar's counsel called Albert Grigar, Jr. in rebuttal. He testified that there was now no other access road to the Grigar property. He also denied that Hatton had ever told him not to use the road at issue. Appellee was then called back to the witness stand, and he testified that he had once tried to acquire a right-of-way through the property next to the church, but was denied. He also confirmed that the road at issue was the only access he had to his property. Grigar's counsel then testified that reasonable and necessary attorney's fees for handling an appeal of the case would be approximately $4,000, and an additional $1,000 if a rehearing was requested. The plaintiff then rested.

After a break, the trial court announced the following findings:

That a road exists and that it contains the .899 acres as surveyed by the surveyor. I find that Mr. Hatton had no right exclusive of any one else to the use of the road prior to his acquisition of the easement deed, and, in fact, had used and predecessors had used that road without having a dedicated right to the

4. Hatton's counsel also asked Hatton how much it had cost him to defend the suit, and he estimated $2,000.

road for many years prior to the acquisition of the easement deed.

The Court further finds that the road was used for ingress and egress by adjoining property owners, including the Plaintiff's predecessors for many years, and that the road was used by the public for many years prior to the acquisition of any rights to the road by Mr. Hatton.

I further find that the Grigar road or the land is land locked. Therefore, I find for the Plaintiffs as to easement by necessity, prescription and implication. Award attorney's fees of $8,500, plus cost of $3,500, and in the event of an appeal to the Court of Appeals fees of $4,000.

The trial court signed a judgment incorporating his findings on June 23, 2000. This appeal followed.

## DISCUSSION

### 1. Standard of Review

■ In their first three issues, appellants assert that the evidence was legally and factually insufficient to support the trial court's findings. When, as here, no findings of fact or conclusions of law are requested or filed, we imply all necessary findings in support of the trial court's judgment. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 83 (Tex.1992). However, because a reporter's record has been provided, the implied findings may be challenged for legal and factual insufficiency the same as jury findings or a trial court's findings of fact. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989). When the implied findings of fact are supported by the evidence, it is our duty to uphold the judgment on any theory of law applicable to the case. *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990). This is true regardless of whether the court articulates the correct legal basis for its judgment. *Harrington v. Railroad Comm'n,* 375 S.W.2d 892, 895 (Tex.1964).

■ When both legal and factual sufficiency issues are raised, we are required to rule on the legal insufficiency issue first. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). If we find some evidence to support the verdict, we will then review the claim of factually insufficient evidence. *Texas Indus., Inc. v. Vaughan,* 919 S.W.2d 798, 801 (Tex.App.-Houston [14th Dist.] 1998, writ denied). A legal sufficiency point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). We consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). If there is any evidence of probative force to support the challenged findings, the legal sufficiency challenge fails. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997).

■ When presented with a factual insufficiency issue, we must review the entire record, and will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The court of appeals is not a fact finder. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would clearly support a different result. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986).

## 2. Implied Dedication

■■■■ "Dedication" is the act of appropriating private land to the public for any general or public use. *Scott v. Cannon*, 959 S.W.2d 712, 718 (Tex.App.-Austin 1998, pet. denied). Once dedicated, the owner of the land reserves no rights that are incompatible with the full enjoyment of the public. *Id.* There are four essential elements of implied dedication: (1) the acts of the landowner induced the belief that the landowner intended to dedicate the road to public use; (2) he was competent to do so; (3) the public relied on these acts and will be served by the dedication; and (4) there was an offer and acceptance of the dedication. *Las Vegas Pecan & Cattle Company, Inc. v. Zavala County*, 682 S.W.2d 254, 256 (Tex.1984). Whether a public right-of-way has been acquired by dedication is a question of fact. *Lindner v. Hill*, 691 S.W.2d 590, 591–92 (Tex.1985); *Viscardi v. Pajestka*, 576 S.W.2d 16, 19 (Tex.1978).

### a. *The acts of the landowner induced the belief that the landowner intended to dedicate the road to public use.*

■■■■ As a general rule, the intention to dedicate must be shown by something more than an omission or failure to act or acquiesce on the part of the owner. *Greenway Parks Home Owners Ass'n v. City of Dallas*, 159 Tex. 46, 55, 312 S.W.2d 235, 241 (1958). There must be evidence of some additional factor that implies a donative intention when considered in light of the owner's acquiescence in the public's use of the roadway. *Long Island Owner's Ass'n v. Davidson*, 965 S.W.2d 674, 681 (Tex.App.-Corpus Christi 1998, pet. de-

nied). The additional factor may include (1) permitting public authorities to grade, repair, or otherwise improve the roadway; (2) selling parcels of land from a plat or plan showing the roadway as a means of access to the parcels; (3) construction of facilities for general public use; (4) an express representation by the owner of a road to a land purchaser that the way is reserved for public use; (5) fencing off the roadway from the remainder of the land; or (6) obtaining a reduction in the purchase price commensurate with the area of the roadway. *Id.*

■■■■ Direct evidence of an overt act or a specific declaration on the part of the landowner indicating an intention to dedicate land to public use as a roadway is not required. *Gutierrez v. County of Zapata*, 951 S.W.2d 831, 838 (Tex.App.-San Antonio 1997, no writ). It is sufficient if the intent is properly inferable from the circumstances in evidence. *Id.; Owens v. Hockett*, 151 Tex. 503, 505, 251 S.W.2d 957, 958 (1952). As the Supreme Court explained in *Owens v. Hockett*:

> the theory of implied dedication carries with it the idea that the owner consented to the use of his land as a highway to the extent that the court will hold that he dedicated it to public use, whether by express words, overt acts, *or even by such inaction on the part of the owner as would justify a conclusion that he intended to dedicate his land to public use.*

*Id.* 151 Tex. at 507, 251 S.W.2d at 959 (emphasis added). There, the court sustained a jury finding of implied dedication for public use, based upon evidence that (1) the road in question had been used by the public for many years prior to the time the landowner erected a fence across it, (2) the landowner knew the road was being used by the plaintiffs and the general public, (3) the landowner and others knew that

the county had repaired and graded the road on many occasions, and (4) the property along the roadway was fenced. 151 Tex. at 506, 251 S.W.2d at 958–59.

Thus, there must be something more than an omission or failure to act or acquiescence on the part of the landowner. *Gutierrez,* 951 S.W.2d at 839. However, the "something more" need not rise to the level of an overt act or an explicit declaration demonstrating a donative intention. *Id.* It is enough that a donative intention be inferred from evidence showing other factors that suggest such an intention under all of the circumstances surrounding the landowner's acquiescence in the public's use of the roadway. *Id.; Owens v. Hockett,* 151 Tex. at 507, 251 S.W.2d at 959.

 In addition, evidence of long and continued use by the public raises a presumption of dedication by the owner when the origin of the public use and the ownership of the land at the time it originated cannot be shown, one way or the other, due to the lapse of time. *Graff v. Whittle,* 947 S.W.2d 629, 637 (Tex.App.-Texarkana 1997, writ denied); *Fazzino v. Guido,* 836 S.W.2d 271, 274 (Tex.App.-Houston [1st Dist.] 1992, writ denied). For this rule to apply, the origin of the public use and the ownership at that time must be " 'shrouded in obscurity, and no proof can be adduced showing the intention of the owner in allowing the use.' " *Fazzino,* 836 S.W.2d at 274 (citing *Dunn v. Deussen,* 268 S.W.2d 266, 269 (Tex.Civ. App.-Fort Worth 1954, writ ref'd n.r.e.)). Thus, in *Fazzino,* the court upheld the jury's finding of an implied dedication based on (1) the testimony of the landowners in the area that "the road was used by the public as far back as they could remember," (2) the fact that none of them could testify to the intentions of the owner when such use began, and (3) the evidence

indicating that the road at issue may have been used by the public as early as 1828. *Id.*

Hatton contends that the evidence is insufficient to demonstrate an implied dedication of the road at issue because the evidence, at best, showed only acquiescence in the use of the road by others, the county had never maintained the road, and some of the fencing along the road was in disrepair or not present. Hatton also contends that the introduction of maps or diagrams into evidence that show that a road existed is not sufficient to imply a dedication to public use. Reviewing the facts in the light most favorable to the court's finding, we cannot agree with Hatton's contention.

 As we have stated, evidence of long and continued use by the public raises a presumption of dedication by the owner when the origin of the public use and the ownership of the land at the time it originated cannot be shown due to the lapse of time. This rule applies here. Kalkomey, the surveyor, testified that despite an investigation into the origin of the road, he was unable to find any official dedication of any kind of roadway in the deed records. However, he identified several deeds that reflected an intent to provide an access road to the properties from Highway 36. Further, Jewerl Ross testified to the existence of the road and its use by families in the area as far back as the 1930's. No one was able to testify regarding the origin of the road.

There was additional evidence supporting the trial court's finding, including testimony that most of the road was fenced on either side. There was also considerable testimony that landowners in the area used the road without objection from the 1950's until 1996, and there was some evidence that the general public traveled the road as well. In addition, a number of

witnesses testified that the road had the reputation of being a public road. Hatton himself testified that he had used the road for business purposes while he had his salvage yard. Further, while he obtained the land in 1973–74, he did not attempt to prevent access to the road until 1996, over 20 years later, when he put up a gate and lock. He also conceded that the other landowners adjacent to the road had the right to use it. Finally, the Grigars testified that there was no other means of access to their property. We find that this evidence is legally sufficient to support the existence of this element.

We next turn to the factual sufficiency review. In addition to the evidence described above, Hatton, Brooks, and Spates each testified that the road was not a public road. Further, it was undisputed that the county did not maintain the road at any time. Schodek, the land surveyor, was unable to opine whether the road was public or private, and testified that, in his opinion, a public road was one maintained by the county. Hatton testified that he had always maintained the road, but also testified that he did so with the assistance of other residents. Hatton also testified that there were no public facilities such as stores, hospitals, or the like on the road. Further, he maintained that he had denied individuals permission to use the road many times, and that he never gave the Grigars permission to use the road.

This evidence demonstrates, at best, that the road was used by the landowners and their families in the area, with or without objection, and that the characterization of the road as public was disputed. The trial court was entitled to weigh the credibility of the witnesses and we will not substitute our judgment for that of the fact finder. Further, the fact that the county never maintained the road is not dispositive in view of the totality of the evidence.

Therefore, we cannot say that the trial court's judgment is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust as to this element.

### b. *The landowner was competent to do so.*

Neither party challenges this element.

### c. *The public relied on these acts and will be served by the dedication.*

Hatton contends that there is no evidence of a public need because the road does not lead to any public facilities such as churches, schools, or cemeteries. He acknowledges, however, that relatives and friends of the property owners did use the road. Further, as noted in the previous section, Hatton himself at one time had a business on the road. Several witnesses testified that the road had the reputation of being a public road, and there was evidence that the public used to road to get to the river to fish, to pick grapes or dewberries, or to dump trash in the area. Finally, the adjacent property owners themselves used the road, and the Grigars testified that there was no other access road to their property.

A public road does not depend upon its length or upon the places to which it leads, nor upon the numbers of persons who actually travel upon it. *Gutierrez*, 951 S.W.2d at 841. In fact, proof that a road is only slightly traveled by the public is not proof that a road is not a public road. *Id.* If it is free and open to all who have occasion to use it, it is a public road. *Id.* Further, evidence of long, continued, unquestioned use of a road supports a finding that the public relied on an implied dedication of that road. *Supak v. Zboril*, 56 S.W.3d 785, 791 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Graff v. Whittle*, 947 S.W.2d at 638. We find the evidence dis-

cussed above legally and factually sufficient to support this element.

d. ***There was an offer and acceptance of the dedication.***

 Hatton contends that the use of the road by business invitees, family friends, and guests is not sufficient to show that there was an offer and acceptance of a dedication by the public. Further, the only evidence of public use was Ross's testimony based on his recollection of events over 68 years ago, and the public has since abandoned the use of the road. However, the courts of this state do not require that the acceptance by the public be express. *Viscardi,* 576 S.W.2d at 19. An implied acceptance by the public is sufficient. *Id.* If an intention to dedicate is otherwise shown, the public use of the land is sufficient to constitute a completed dedication. *Id.* We have detailed above the evidence supporting the implied dedication to the public and the use of the road, without objection, for nearly seventy years. We therefore disagree with Hatton's statement that the only evidence of public use was the testimony of Ross, and in any event, Hatton has waived the affirmative defense of abandonment because he failed to plead it. *Fazzino,* 836 S.W.2d at 274–75. We find that the evidence is legally and factually sufficient to support this last element of an implied dedication to the public.

Accordingly, we uphold the trial court's judgment that the road in question is a public road.

**3. Easement by Prescription, Implication and Necessity**

In addition to finding that the road was a public road, the trial court also found that the Grigar property was landlocked, and granted an easement by prescription, implication, and necessity in favor of Grigar. However, because we have found the evidence sufficient to uphold the trial court's finding that the road was public, we need not reach these issues. Nor is it necessary for us to reach Grigar's cross-issue that an easement by estoppel exists.

**4. Attorney's Fees**

 In his last point, Hatton contends that the trial court erred in awarding attorney's fees to Grigar under the Declaratory Judgments Act. TEX. CIV. PRAC. & REM.CODE ANN. § 37.001–37.011 (Vernon 1997 & Supp.2001). The Declaratory Judgments Act provides that in any proceeding under the Act "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). The Act does not require an award of attorney's fees to the prevailing party, but merely provides that a court "may" award them. *Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998). The Act entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law. *Id.* at 21.

The trial court's judgment ordered that Grigar recover, jointly and severally from the defendant, attorney's fees in the sum of $8,500.00 for the services rendered through the trial of the case, costs of $3,500.00, and $4,000.00 in the event of an unsuccessful appeal to the court of appeals. The only basis upon which Hatton complains of the trial court's award of attorney's fees is that the evidence is factually insufficient to support that judgment. Because we have upheld the trial court's judgement, we overrule this issue.

Accordingly, the judgment of the trial court is affirmed.